

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| WILLIAM McGHEE, | ) |
| | ) |
| Respondent, | ) |
| | ) **WD78744** |
| v. | ) |
| | ) **OPINION FILED:** |
| | ) **August 9, 2016** |
| SCHREIBER FOODS, INC., | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Henry County, Missouri**
**The Honorable James K. Journey, Judge**

**Before Division Two:** Karen King Mitchell, Presiding Judge, and
Cynthia L. Martin and Gary D. Witt, Judges

William McGhee filed suit under the Missouri Human Rights Act (MHRA) against

Schreiber Foods, Inc., alleging age discrimination in his termination from employment. A jury

found in favor of McGhee, and the trial court entered a judgment totaling $1,170,030.45 in

damages, costs, and attorneys' fees. Schreiber appeals the trial court's denial of its motions for

judgment notwithstanding the verdict, new trial, and remittitur. Finding no error, we affirm.

## Background[1]

On October 5, 2009, McGhee was employed as a press operator at Schreiber's plant in

Clinton, Missouri. McGhee operated a large commercial printing press, known as a Vision

---

[1] "Our standard of review requires that we view the facts in the light most favorable to the trial court's verdict and accept as true evidence and inferences favorable to the trial court's judgment while disregarding contrary evidence." *Higgins v. Ferrari*, 474 S.W.3d 630, 639 (Mo. App. W.D. 2015).

Press.  One of a press operator's duties is to conduct periodic maintenance and cleaning on the press, which includes cleaning the large steel drum on the inside of the press.  The press is a dangerous machine, capable of causing severe injury or death, and, for that reason, Schreiber's policies and procedures manual included a "lockout/tagout program," which every press operator must follow in order to de-energize the press before touching it to clean it.  Part of the lockout/tagout policy is the "inch[-]safe service method," by which the employee slowly "[j]og[s] the drum . . . to the point that needs to be cleaned, and then stop[s] the" drum.  After the drum has stopped, the employee is to "[w]ipe off the drum . . . and then remove the cleaning hand and [j]og to the next spot that needs to be cleaned, and stop again."  In other words, this method of cleaning prohibits an employee from touching the press drum while it is in motion.  A violation of the lockout/tagout policy is considered a "Group III" violation, for which the consequence is discharge.

On October 5, 2009, McGhee's supervisor, Chuck Burton, and Human Resources Manager Ken Kephart, received a report from two employees alleging that McGhee was cleaning the drum as it was rotating, which constituted a violation of the inch-safe method.  Burton and Kephart called McGhee into a meeting to discuss the alleged violation.  McGhee denied cleaning the drum while it was moving and offered to demonstrate his cleaning method on the machine.  Burton and another supervisor, Philip Smith, went to the Vision Press with McGhee, where he demonstrated how he cleaned the drum.  At the press, McGhee demonstrated that he cleaned the drum by slowly jogging it forward, then stopping the drum and reaching forward with his rag to clean it.  McGhee recalled one of the men saying that someone watching from another vantage point "might misconstrue that as a violation," when cleaning occurs so soon after the drum stops moving, because there is still a danger that built up "kinetic energy" might cause the "drum to surge."

2

The next day, Burton and Kephart issued a "Coaching and Corrective Action Form" to McGhee, noting that he had been given a Group III corrective action, with automatic suspension pending termination, for a lockout/tagout policy violation. The reason given was that McGhee had been "observed cleaning the drum on the [press] while the drum was in motion and not using the inch[-]safe service method." McGhee filed an appeal under Schreiber's peer review policy.

Under Schreiber's policy, an employee facing termination for a Group III violation may appeal this determination to either the Plant Manager or a "Peer Review Panel." McGhee sought review of his Group III corrective action by peer review panel. Schreiber's policy allows a panel to "review management's actions to ensure that application of policy or practice was followed correctly and consistently." A panel has the authority to grant or deny an appeal, or to modify management's decision to a lesser punishment. A panel is not allowed to "modify a decision to make it more severe than the original management action." Rather, a panel can only leave the initial punishment in place or reduce it.

Panels are comprised of five members, three of whom are hourly employees of the same classification as the employee, and two of whom are salaried or managerial employees. The employee chooses a panel by picking the names of five hourly employees from a hat and then selecting three of the five. The employee then picks the name of three salaried/managerial employees from a hat and selects two of the three. The HR Manager, Kephart, facilitates the process. He is "responsible for scheduling meetings, handling all required logistics, generating panel records[,] and ensuring that all sessions conform to" policy. The HR Manager also "suggest[s] that certain witnesses be called" to present evidence.

McGhee chose to file an appeal to the peer review panel, which upheld the termination. In April of 2010, following additional incidents involving safety violations at Schreiber, discussed more fully *infra*, which McGhee believed were handled inconsistently with his

3

termination, McGhee sent an email to Plant Manager Rick Heck, asking that his termination be reconsidered. Schreiber responded with a letter setting forth its belief that "your termination for a lockout safety violation was appropriate, fair[,] and consistent with policy and the way other similar situations were handled." The letter continued, "An additional peer review completed by a Home Office HR person was also conducted and it concluded that the termination and peer review were handled appropriately." The letter concluded that Schreiber could not "offer [McGhee] any hope of reinstatement." Following a complaint to the Missouri Commission on Human Rights, McGhee filed suit, alleging that Schreiber had discriminated against McGhee based on his age.

At trial, there was evidence presented that the two employees who initially reported that they had seen McGhee cleaning the drum while it was in motion could not have seen McGhee's actions from the vantage point from which they claimed to have watched him. And while Burton, who was present during McGhee's demonstration of his cleaning method, testified at trial that he saw McGhee touch the drum during his demonstration, Kephart testified, and the written notes from the peer review reflect, that Burton told the panel that McGhee was reaching toward the drum while it was in motion and it *looked* as though he was going to make contact with it, but Burton reached out and stopped McGhee.

Over Schreiber's objection, McGhee introduced evidence of six current and former employees of Schreiber who were accused of safety violations, four of them under the age of forty, and two over the age of fifty, at the time of their incidents. The stated intent was to show that, having committed similar safety violations, the four younger employees were treated more favorably than the three (counting McGhee) employees over the age of fifty.

Denise Davis, age thirty-six, was a press operator at Schreiber's plant. On March 30, 2009 (approximately six months before McGhee's incident), while Davis was cleaning the press

4

drum as it was rotating, her hand became caught between the drum and other parts of the machine, causing severe damage to Davis's hand and arm. Davis was given a Group II corrective action, which was a less serious violation than Group III. Group II violations included a monetary penalty, but did not include the threat of immediate termination. Davis appealed the Group II violation to a peer review panel, which upheld the punishment.

Immediately after Davis's violation, Schreiber amended its policy to explicitly require that press operators use the inch-safe service method when cleaning the drum. The revised policy also included an extensive definition, consisting of several sentences, of the inch-safe method.

Six weeks later, fifty-four-year-old Roger Mehan was working as a press operator at Schreiber's plant when he used a piece of plastic to knock an accumulation of ink from a piece of equipment called an anilox, which is located close to the drum. The drum was in motion, but Mehan's hand did not come into contact with any moving parts. Kephart testified that it was a "gray area" whether knocking ink off with a stick, as opposed to one's hand, would be a violation of the lockout/tagout policy. Nevertheless, Mehan received a Group III corrective action for violating the lockout/tagout policy, which he appealed to the Plant Manager. Mehan's Group III violation was upheld, but he was given the opportunity to stay with Schreiber by signing a "last chance agreement," which is available only to employees with no prior safety violations.[2] A last chance agreement allows the employee to keep his job, but the violation of any work rule within the next twelve months results in termination.

Kenny Raynes, age thirty-nine, and Russ Seedyk, age thirty-six, were also press operators at Schreiber's plant. On March 25, 2010, Raynes and Seedyk's supervisor, Jared Fosnow, reported that Raynes and Seedyk were in the "danger zone" of the "rewind" section of the press

_____

[2] McGhee had received a Group II corrective action several months prior to the violation at issue here, for an incident in which he was injured when cutting a rubber hose, which he was holding over his knee, in violation of policy. He was, therefore, according to Schreiber, not eligible for a last chance agreement.

5

while the press was not properly locked out and tagged out. In addition to requiring that an employee not touch the moving drum of the press, the lockout/tagout policy required that an employee working in a machine's danger zone attach his or her lock to the power source. Both operators initially received Group III corrective actions for lockout/tagout violations. Seedyk and Raynes both appealed to Plant Manager Richard Heck. Raynes admitted that he violated the lockout/tagout policy by "not applying locks when required or making sure [his] partner had [his] locks installed." He also described in his review application how Seedyk violated the lockout/tagout policy by leaning into the danger zone to cut film loose without first applying a lock to the air pressure valve. Seedyk, however, told Heck that he and Raynes had properly inserted their locks to lockout/tagout the press. Heck determined that, "due to inconsistencies" in Seedyk's and Raynes's stories, he was "unable to say with 100% confidence that a lockout/tagout violation occurred." Heck did, "however, believe . . . that safety practices performed . . . were questionable." Heck therefore reduced the corrective action from a Group III to a Group II, for "violation of safety rules or plant safety practices." Heck was unable to articulate what violation of safety rules took place, other than a lockout/tagout policy violation.

On April 21, 2010, fifty-seven-year-old laminator operator Tom Weaver was issued a Group III corrective action for a lockout/tagout policy violation when he was observed by supervisor Chad Williams inside the "unwind turret" of the laminator machine without his lock applied to the energy source of the press. Weaver sought peer review of his corrective action. Weaver explained during peer review that he was not working on the machine, but rather was handing rags or tools to maintenance employee Rick Jackson, who was working on the machine. When Weaver was inside the unwind turret, Jackson's locks were applied to the machine. With

Jackson's locks applied, the unwind turret was incapable of moving. The peer review panel upheld the termination.

On December 23, 2011, three press operators reported that they had witnessed 25-year-old press operator Nathan Tirey violating the lockout/tagout policy while cleaning the press drum. One of the witnesses was McGhee's former partner, Teresa Kaiser. Kaiser submitted a written statement to supervisor Chuck Burton describing her observations, including that she and two other operators were standing near the press while Tirey was cleaning, and noticed the drum was continuously moving. Kaiser then approached the back of the press where Tirey was standing and she saw Tirey reaching past the guard and wiping the drum while it was moving. When Tirey saw Kaiser standing there, he stopped what he was doing and waited for her to leave before starting back up again. Tirey was issued a Group III corrective action, and he requested peer review. Tirey testified at trial that the witnesses could not have seen him cleaning the drum from their vantage points, and explained that he was rotating the drum with a rag lodged between the drum and another piece of equipment and that he was not physically touching the drum. Tirey's request for peer review did not contain the explanation he gave to the jury, and the notes from his peer review were apparently lost, leaving no documentation from the review. The peer review panel reversed the corrective action entirely, but recommended that Tirey "be retrained in the inch[-]safe service method." Marty Kline, a press operator who served on Tirey's peer review panel, testified that the panel recommended training for Tirey because "there was some gray area in the way in his statement on how he was doing it."

Following trial, the jury found in favor of McGhee and awarded $300,000 in compensatory damages and $350,000 in punitive damages. The trial court entered judgment in accordance therewith, in addition to awarding McGhee $386,282.81 in attorneys' fees,

7

$14,820.27 in costs, $66,512.20 in front pay, and prejudgment interest in the amount of $52,415.17, for a total judgment of $1,170,030.45. Schreiber appealed.

**Analysis**

In Schreiber's five points on appeal, it argues that the trial court committed reversible error in: (1) denying Schreiber's motion for judgment notwithstanding the verdict because the six other disciplined employees were not similarly situated to McGhee, in that their discipline was either decided by different decision makers or they were subject to different conduct policies, and thus the evidence did not support a finding of discriminatory intent or motive; (2) denying Schreiber's motion for new trial because the evidence of discipline of six comparators was not admissible because they were not similarly situated to McGhee; (3) denying Schreiber's motion for judgment notwithstanding the verdict because there was insufficient evidence to support a finding of age discrimination; (4) denying Schreiber's motion for judgment notwithstanding the verdict on the award of punitive damages because McGhee failed to offer sufficient evidence to prove that Schreiber acted with evil motive or reckless indifference; and (5) denying Schreiber's motion for remittitur of the punitive damages award because the totality of the circumstances show that the punitive damages award was excessive.

Schreiber's first three points all rely on its contention that the disciplinary outcomes of comparators offered by McGhee as evidence of discrimination were inadmissible because the comparators were not similarly situated to McGhee.[3]   Accordingly, we discuss the points together.

_____

[3] "[I]n the disparate treatment context . . . the plaintiff must prove that the motivating distinguishing factor leading to the more severe discipline was his or her membership in the protected group." *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 120 (Mo. banc 2015). "In the context of 'me too' evidence . . . , the plaintiff's claim of relevance is . . . that he and others were treated similarly by being disciplined or fired and that the dominant common factor between himself and the others who were disciplined or fired is their membership in the protected group." *Id*. "[T]he admissibility of 'me too' evidence does not require that the nonparty employees be 'similarly situated' under the more stringent disparate treatment standard . . . ." *Id*. at 123. Although neither party briefed the issue, Schreiber assumes that all of the comparators are subject to the "disparate impact" analysis, while McGhee implies that the comparators over the age of forty are subject to the less stringent "me too" standard. Because the

8

## I. Evidence of Comparator Employees

"Generally, trial courts enjoy considerable discretion in the admission or exclusion of evidence, and we will only reverse a decision of the trial court upon a finding of an abuse of discretion." *Foreman v. AO Smith Corp.*, 477 S.W.3d 649, 655 (Mo. App. E.D. 2015). "We will not find an abuse of discretion unless the ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration." *Id*. (quoting *8000 Maryland, LLC v. Huntleigh Fin. Servs. Inc.*, 292 S.W.3d 439, 446 (Mo. App. E.D. 2009)). "Our standard of review for a trial court's denial of a motion for new trial is the same [as] the standard for the admission or rejection of evidence . . . : for abuse of discretion." *Id*. at 657.

"The standards of review for denial of a motion for directed verdict and denial of a motion for judgment notwithstanding the verdict are essentially the same." *Hurst v. Kansas City, Mo. Sch. Dist.*, 437 S.W.3d 327, 336 (Mo. App. W.D. 2014) (quoting *DeWalt v. Davidson Serv./Air, Inc.*, 398 S.W.3d 491, 498 (Mo. App. E.D. 2013)). "When reviewing a circuit court's denial of a judgment notwithstanding the verdict, [t]his [c]ourt must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability." *Spalding v. Stewart Title Guar. Co.*, 463 S.W.3d 770, 778 (Mo. banc 2015) (quoting *Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013)). "We view 'the evidence in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict.'" *Hurst*, 437 S.W.3d at 336 (quoting *Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. banc 2012)). "This [c]ourt will reverse the jury's verdict for insufficient evidence only where

---

comparators are similarly situated to McGhee under the more exacting standard, we need not decide this issue. Moreover, Schreiber does not argue that, because McGhee's theory is that older employees were treated more harshly than younger employees, Mehan and Weaver needed to be similarly situated to Davis, Seedyk, Raynes, and Tirey. We therefore do not decide the issue.

there is a complete absence of probative fact to support the jury's conclusion." *Smith*, 410 S.W.3d at 630.

Under the MHRA, "It shall be an unlawful employment practice . . . [f]or an employer . . . to discharge any individual . . . because of such individual's . . . age . . . ." § 213.055.1(1)(a). The statute defines "age" as "forty or more years but less than seventy years." § 213.010(1). "In reviewing a case brought under the MHRA, appellate courts look to Missouri law but also are guided by federal employment discrimination cases to the extent they are consistent with Missouri law." *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 115 (Mo. banc 2015). However, "the MHRA is 'not identical to the federal standards and could offer greater protection' against discrimination than that offered under Title VII." *Id.* (quoting *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 383 (Mo. banc 2014)). "In particular, under the MHRA a plaintiff must show that his age was a 'contributing factor' in the discriminatory act, while the federal cases apply the more stringent 'motivating factor' standard." *Id.* at 115-16.

"[I]nstances of disparate treatment," that is, when the employee has been treated differently from other employees, "can support a claim of" discrimination under the MHRA. *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 873 (Mo. App. E.D. 2009) (quoting *Young v. Am. Airlines, Inc.*, 182 S.W.3d 647, 654 (Mo. App. E.D. 2005)). But where the plaintiff attempts to prove his case based upon disparate treatment, "the plaintiff bears the burden of establishing that the employees are similarly situated in all relevant respects." *Id.* (quoting *Young*, 182 S.W.3d at 654). "In such 'disparate treatment' claims, the relevance of evidence as to the treatment of coworkers depends on whether those coworkers were otherwise similarly situated to the plaintiff." *Cox*, 473 S.W.3d at 119. "In determining whether coworkers were 'similarly situated,' courts analyze factors including whether the same supervisor imposed the

10

discipline, whether the coworkers were subject to the same standards, whether they engaged in conduct of similar seriousness, and similar factors." *Id*.

Schreiber argues that the trial court erred in admitting evidence of discipline imposed on other employees. "The trial court has broad discretion in determining whether to admit or exclude evidence." *State v. Johnson*, 477 S.W.3d 218, 226 (Mo. App. W.D. 2015) (quoting *State v. Joyner*, 458 S.W.3d 875, 880 (Mo. App. W.D. 2015)). "Thus, we review the trial court's decisions regarding the admission of evidence for an abuse of discretion." *Id.* (quoting *Joyner*, 458 S.W.3d at 880). "The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id*. (quoting *Joyner*, 458 S.W.3d at 880).

## A. Same Decision Makers

Schreiber first argues that McGhee was not similarly situated to the comparators because different decision makers determined the appropriate punishment for the alleged violation of each of the comparators. Schreiber's argument is two-fold: (1) in order to be similarly situated, the same decision maker must have made the final employment decision; and (2) different decision makers made the final decisions for each of the employees at issue in this case, meaning that none of the comparators were similarly situated to McGhee. Under Schreiber's argument, the employees, who were each subject to discipline for alleged violations of the lockout/tagout policy, each chose an appeal route: either to the plant manager or the peer review panel. In the case of employees who chose review by the plant manager, their discipline was determined by a different decision maker than McGhee, who chose review by a peer panel. And for other employees who chose also peer review, the decision maker was still different because the panels had few, if any, of the same members; no person served on every panel; and no two panels had more than a single member who was the same as any other panel.

11

Schreiber is correct that, "[i]n the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (internal quotations omitted). But, we have found no cases holding, as Schreiber contends, that a common decision maker is unequivocally required in order for comparators to be similarly situated. The Missouri Supreme Court has called the same decision maker a "factor" in determining whether comparators are substantially similar. *Cox*, 473 S.W.3d at 119. The Court also noted that, "[e]ven in the disparate treatment context, similarly situated employees need not be identical in every conceivable way. . . . So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied." *Id*. at 123 n.14 (internal quotations omitted). Other courts have also treated the existence of a common decision maker as important, but not absolutely necessary, to a finding that employees are similarly situated. *Coleman*, 667 F.3d at 847 ("The inference of discrimination is weaker when there are different decision-makers, since they 'may rely on different factors when deciding whether, and how severely, to discipline an employee.'") (quoting *Ellis v. United Parcel Serv.*, 523 F.3d 823, 826 (7th Cir. 2008)).

But even assuming that a common decision maker is required for comparators to be substantially similar, "[w]hether a comparator is similarly situated is 'usually a question for the fact-finder . . . .'" *Coleman*, 667 F.3d at 846 (quoting *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)). And accepting the facts, as we must, in the light most favorable to the jury's verdict, they support a finding that the comparators and McGhee all had a common decision maker.

12

We must begin with a general overview of the Schreiber disciplinary process. When Schreiber is notified of a potential violation of a safety policy, the "leadership team" gathers information to determine the seriousness of the violation. The leadership team consists of the Plant Manager, HR Manager, other salaried leaders in the plant, and people in the Schreiber home office to whom those individuals report. In other words, management from Schreiber's corporate home office is directly involved in the investigation and makes the determination as to whether a violation has occurred and the appropriate punishment. And, per Schreiber's Corrective Action Policy, "The severity of each case will be determined by the leadership team."

In the case of Davis, the leadership team determined that she had committed a Group II violation (which did not subject her to termination), while McGhee and the rest of the comparators were initially given Group III violations (and were thus subject to termination). As noted, an employee for whom discipline was recommended could seek review by the plant manager or a peer review panel. Whichever review was chosen, it could not increase the punishment; it could only affirm the punishment or reduce it. Thus, as to Davis and McGhee, the alleged disparate treatment took place at the initial decision stage—the punishment imposed by the leadership team. Davis and McGhee were similarly situated as it pertains to the decision maker recommending the punishment.

Whether decision makers involved in the decision of whether and how to discipline the remaining comparators were also involved in the decision to discipline McGhee is not as clear cut. But the facts support a finding that the same decision makers were involved in the decision to discipline the comparators and McGhee. After the leadership team makes its determination, the employee is able to appeal the determination, either to the plant manager or to a peer review panel, under the procedures outlined *supra*. Schreiber repeatedly notes that its peer review policy refers to panel decisions being "final and binding," meaning, it argues, that the individual

panels are the final decision makers.  But Schreiber's policy also required the "Plant Manager [to] review[] all documentation to [e]nsure completeness, consistency[,] and fairness for those peer reviews conducted by the panel process."  Therefore, the plant manager had final authority over all terminations that were appealed.  "[T]he issue is not only who proposed the [discipline] but who was 'responsible' for the decision."  *Coleman*, 667 F.3d at 848 (quoting *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011)).

Heck, plant manager at the time of McGhee's termination, testified that, if he had questions about any terminations resulting from the appeal process, he would "have . . . additional discussions with the leadership team and [Kephart] and those at the home office."  The plant manager answered directly to Schreiber's corporate office and ran alleged conduct violations and their punishments by the corporate office.  The jury could have determined that, both by policy and in practice, Schreiber's senior management and home office continued to exercise final decision-making authority over all employment determinations, even after the alleged "final and binding" decisions of the peer review process.  *See Cox*, 473 S.W.3d at 121 (Where different decision makers all "directly reported to" the same individual, the court must "account for the common decision maker."); *Holmes v. Kansas City Mo. Bd. of Police Comm'rs*, 364 S.W.3d 615, 627-28 (Mo. App. W.D. 2012) (Rejecting "the Board's contention that it could not be held responsible for a MHRA violation because it was the Chief who made disciplinary decisions concerning [certain] officers, . . . while it was the Board who terminated [others]," because "the Chief is the Board's agent, serving at the Board's 'pleasure[,]' . . . [and] under the MHRA, knowledge of a supervisor's conduct may be imputed to the employer.").

Even if, as Schreiber argues, a common decision maker is required in order for comparators to be similarly situated, the evidence, viewed in the light most favorable to the verdict, supports a finding of common decision makers.

14

### B. Similar Conduct and Standards

Schreiber next argues that three of the comparators who were under the age of forty (Tirey, Seedyk, and Raynes) are not similarly situated to McGhee because he admitted to a violation of the lockout/tagout policy, while the others denied having committed violations and were exonerated in the appeal process. Schreiber also argues that Davis was not similarly situated because the lockout/tagout policy had changed so significantly between her violation and McGhee's conduct that the two employees were subject to different standards of conduct.

#### i. McGhee's Alleged Admission

First, as to McGhee's "admission," he did, in his letter requesting peer review, refer to his cleaning procedure as "less than acceptable," and "technically a violation of proper procedure." But McGhee testified that this statement was in response to Smith and Burton's initial claim that McGhee had committed a violation by reaching toward the drum while potential "kinetic energy" could have built up, and that the statement was made because Burton and Smith had told McGhee that the process would "go better for" him if he would admit to the violation. But the only violation that McGhee was charged with was "cleaning the drum . . . while the drum was in motion." In fact, that was the only violation of the lockout/tagout policy McGhee could have been charged with, as the policy did not prohibit simply "reaching for" equipment that was still in motion or immediately after it had stopped moving. There is no unqualified admission to a lockout/tagout violation in the appeal letter, which indicates that the drum was "stopped" when McGhee was cleaning it. McGhee testified that he never cleaned the drum while it was moving. There was conflicting evidence as to whether McGhee admitted, at the peer review hearing, to cleaning the moving drum, but the jury was entitled to believe the evidence tending to show that he did not make such an admission.

### ii. Seedyk and Raynes

Seedyk and Raynes were both given Group III corrective actions for failing to place their locks on the energy source of the rewind machinery while they were inside the press performing maintenance—a violation of the lockout/tagout policy. Seedyk and Raynes both appealed to the plant manager, Heck, who determined that, "due to inconsistencies" in Seedyk's and Raynes's stories, he could not determine that a violation of the lockout/tagout policy had occurred, so he downgraded the punishment from a Group III to a Group II. Heck testified that he did find that a safety violation had occurred, which is why Raynes and Seedyk received Group II corrective actions. But Heck was unable to provide any reasonable answer as to what policy or rule was violated other than the lockout/tagout policy, which would mandate a Group III corrective action. We view the evidence "in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences." *Spalding*, 463 S.W.3d at 778 (quoting *Smith*, 410 S.W.3d at 630). A reasonable inference that the jury could have drawn from this testimony is that Heck found that Seedyk and Raynes did commit a Group III violation, but he chose to reduce the punishment for the violation to a less serious Group II corrective action.

### iii. Tirey

Tirey was written up for a Group III violation for the same reasons as McGhee—cleaning the drum while it was in motion. Tirey testified that he was not touching the drum as it moved; instead, he had stuffed a rag between the drum and some other equipment while the drum was stopped, but the rag was positioned so that it would clean the drum when it resumed moving. Despite the fact that three witnesses claimed to have seen Tirey clean the drum while it was in motion, a member of Tirey's review panel testified that the panel overturned the Group III violation because Tirey "didn't admit to touching the drum while it was in motion and no one

16

physically seen [sic] him touch the drum while it was in motion." Based on this testimony, Schreiber claims that the jury was bound to find that "Tirey did not commit a [l]ockout-[t]agout violation," and that Tirey and McGhee were, therefore, not similarly situated. Schreiber fails to acknowledge that "[t]he jury, as the trier of fact, was free to believe or disbelieve all, part or none of the testimony, even if it was unimpeached or uncontradicted." *Wampler v. Speake*, 479 S.W.3d 771, 775 (Mo. App. S.D. 2016) (quoting *Harmon v. Hamilton*, 903 S.W.2d 610, 613 (Mo. App. S.D. 1995)). Moreover, the review panel did not have access to the punishment handed down in prior situations or the results of prior peer reviews. The plant manager did have access to that information, both when he conducted the reviews that came directly to him and when he reviewed panel decisions. And again, the jury could have found that the plant manager, in conjunction with Schreiber's home office, was the ultimate decision maker.

Schreiber also argues that, because Tirey's violation, which took place in December 2011, occurred approximately twenty-six months after McGhee's incident in October 2009, the conduct is too remote for the two employees to be similarly situated. Citing to cases that generally refer to the temporal proximity between incidents as a "factor" that can be considered, Schreiber asks us to conclude that, "[d]ue to the long period of time between the discipline of [McGhee] and" Tirey, the two are "not similarly situated." Schreiber cites to no case in which a court has determined that comparators were not similarly situated due solely to temporal proximity. Indeed, Schreiber has not cited a case in which temporal proximity is applied as a factor, much less a case that applies a bright-line standard that events occurring twenty-six months apart are too remote to be relevant.

Certainly, the passage of time, especially if paired with other changes, can cause incidents to be too remote for comparators to be similarly situated. *Arceneaux v. Metro. Life Ins. Co.*, 481 Fed. Appx. 196, 199 (5th Cir. 2012) (holding that the passage of two to three years

17

between incidents and a different supervisor making the employment decisions caused comparators not to be substantially similar); *Cardiel v. Apache Corp.*, 559 Fed. Appx. 284, 288 (5th Cir. 2014) (holding that the passage of "ten to eleven years between incidents" was too remote, particularly when the policy had changed during that time). But here, Schreiber has not pointed to a single relevant policy that changed between McGhee's and Tirey's incidents. And the same plant manager, HR manager, and supervisor were in place at the time of both incidents. We cannot say that the passage of twenty-six months between the incidents, without more, renders the incidents so remote that McGhee and Tirey are not similarly situated.

### iv. Davis

Finally, Schreiber argues that Davis was not similarly situated to McGhee because different policies were in place at the time of their respective incidents. Specifically, Schreiber argues that the inch-safe method was not part of the lockout/tagout policy at the time of Davis's injury.

The parties agree that the policy was changed after Davis's injury to more explicitly make the inch-safe procedure a part of the policy, and to include a definition of the inch-safe method. But evidence was presented from which the jury could have concluded that the inch-safe procedure was part of the lockout/tagout policy even before the amendment. The lockout/tagout policy in effect at the time of Davis's accident specifically addressed how machines were to be cleaned, and instructed users to "us[e] the jog control in the immediate vicinity of the opened access door or guard." Burton and Kephart both agreed that this requirement is the same as the inch-safe procedure, and that, despite the later amendments to clarify the lockout/tagout policy, the inch-safe procedure was a part of the lockout/tagout policy at the time of Davis's accident. Violations of the lockout/tagout policy were, at all relevant times, a Group III violation. Thus, while there were subsequent additions to the policy, the jury

18

could have determined that both Davis and McGhee failed to use the required inch-safe procedure, that the procedure had not changed between the two incidents, and that both failures constituted violations of the lockout/tagout policy. We, therefore, cannot say that the policies in effect at the time of Davis's and McGhee's incidents were so different to render the two employees not similarly situated.

## C. Sufficient Evidence

Having determined that there was sufficient evidence from which the fact-finder could have determined that the comparators were all similarly situated, we turn to whether there was sufficient evidence to support McGhee's claim of discrimination. McGhee's age discrimination claim has three elements: (1) he was discharged; (2) his age was a contributing factor; and (3) he was damaged as a result. *Hilfiker v. Gideon Sch. Dist. No. 37*, 403 S.W.3d 667, 670 (Mo. App. S.D. 2012). Schreiber challenges only the second element.

Plaintiffs alleging discrimination can prove the element by showing that the plaintiff has been treated more harshly than similarly situated employees in similar circumstances. *Cox*, 473 S.W.3d at 120. There is no magic number for the number of similarly situated employees a plaintiff must show in order to prove discrimination, and as few as one comparator can suffice. *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (holding that a plaintiff "must identify a similarly situated employee . . . who engaged in the same behavior and was treated more favorably"); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003) (holding that plaintiff made a submissible case for discrimination based on disparate treatment using a single comparator).

Here, McGhee offered evidence of a total of seven employees—four under the age of forty, and three over the age of fifty—similarly situated to each other except for their ages. Having committed similar violations of the lockout/tagout policy, the four employees under forty

19

years old initially received a Group II corrective action or subsequently had their corrective action either reduced to Group II or rescinded entirely upon review. The three older employees were all given Group III corrective actions, mandating termination.[4] All corrective actions were upheld on review. Any time a Schreiber witness referenced "gray areas" or "inconsistencies," those gray areas were routinely found to be reasons to reduce or rescind the punishments of younger employees. In contrast, any gray area or inconsistency served as a reason to uphold the more severe penalty for employees over age fifty. From this, the jury could have reasonably concluded that Schreiber committed discrimination based on McGhee's age.

Additionally, the jury could have found that the reason provided for McGhee's termination was unworthy of credence. Evidence was presented that the employees who initially reported seeing McGhee touching the moving drum could not have seen what they reported from their vantage point. And there is a substantial dispute over whether anyone ever actually saw him clean the drum while it was moving. "Evidence that an employer's explanation for its decision is 'unworthy of credence' is one factor that 'may well suffice to support liability.'" *Ferguson v. Curators of Lincoln Univ.*, WD 78752, 2016 WL 3071979, at *5 (Mo. App. W.D. May 31, 2016) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 613 (1993)); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

The trial court did not err in concluding that the comparators offered as evidence of discrimination were similarly situated to McGhee. The evidence of these comparators, along

---

[4] Even though Mehan was not terminated, his punishment was more severe than the employees who received Group II corrective actions. Under the last chance agreement, the employee will be subject to termination for the next violation of any work rule, no matter its severity. Termination is not the applicable punishment for Group II violations until a fourth Group II offense is committed within a year.

with the additional evidence presented at trial, was sufficient to support a finding of age discrimination. Schreiber's first three points are denied.

## II.     Punitive Damages

Schreiber's final two points relate to punitive damages. In its fourth point, Schreiber argues that the trial court erred in denying its motion for judgment notwithstanding the verdict on the jury's award of punitive damages because there was no evidence that Schreiber's conduct was outrageous because of "evil motive" or "reckless indifference." In its final point, Schreiber argues that the trial court erred in not granting its motion for remittitur of the punitive damages award. Schreiber argues that the award of $350,000 was manifestly excessive under the totality of the circumstances. We reject both arguments.

### A.  Evidence Supporting Punitive Damages

The MHRA authorizes punitive damage awards. § 213.111.2. Under the MHRA, "to recover punitive damages, plaintiffs [must] adduce 'clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred.'" *Hill v. City of St. Louis*, 371 S.W.3d 66, 71 (Mo. App. E.D. 2012) (quoting *Alhalabi v. Mo. Dep't of Nat. Res.*, 300 S.W.3d 518, 529 (Mo. App. E.D. 2009)). "A submissible case [for punitive damages] is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Alhalabi*, 300 S.W.3d at 529. "Whether there is sufficient evidence to support an award of punitive damages is a question of law." *Diaz v. AutoZoners, LLC*, 484 S.W.3d 64, 88 (Mo. App. W.D. 2015) (quoting *Alhalabi*, 300 S.W.3d at 528). "[W]e view the evidence and all reasonable inferences in the light most

favorable to submissibility and we disregard all evidence and inferences which are adverse thereto." *Id.* (quoting *Alhalabi*, 300 S.W.3d at 528-29).

The majority of Schreiber's arguments are identical to those rejected earlier: Davis was operating under a different standard of conduct; Seedyk, Raynes, and Tirey were exonerated by Schreiber's appeal process; and McGhee admitted to a violation. These arguments will not be rehashed here other than to note, again, that "the jury is the sole and final arbiter of the facts and, in that role, the jury is entitled to believe or disbelieve all or any part of the evidence before it." *State v. Pierce*, 433 S.W.3d 424, 432 (Mo. banc 2014).

Schreiber's only other argument is that McGhee "presented no direct evidence of discriminatory statements, actions[,] or policies." However, "[p]unitive damages may be proven by circumstantial evidence and there is no requirement of direct evidence of intentional misconduct as most employment discrimination cases are inherently fact-based and necessarily rely on inferences rather than direct evidence." *Bowolak v. Mercy E. Cmtys.*, 452 S.W.3d 688, 698 (Mo. App. E.D. 2014) (internal quotation omitted). "Employment discrimination cases . . . 'often depend on inferences rather than on direct evidence . . . because employers are shrewd enough not to leave a trail of direct evidence.'" *Cox*, 473 S.W.3d at 116 (Mo. banc 2015) (quoting *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818, 818 n.4 (Mo. banc 2007)). "Therefore, individual plaintiffs claiming discriminatory employment action on the basis of age, or any other protected classification, generally must rely on circumstantial evidence." *Id.*

The same evidence supporting the discrimination claim can also support a claim for punitive damages. *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 871 (Mo. App. E.D. 2009). Again, McGhee presented evidence that a fact-finder could reasonably have found to establish that, when it came to employees over the age of fifty, Schreiber had a pattern of strictly reading its policies to require termination for all conduct that could be construed as Group III

22

violations. But, when younger employees engaged in similar conduct, Schreiber either determined that it did not violate policy or sanctioned reducing the penalty to that of a Group II violation. Moreover, after Seedyk's and Raynes's corrective actions were reduced to Group II, when they had initially been charged with Group III violations, McGhee sent Schreiber an email again contesting his termination, thus giving Schreiber another opportunity to review the consistency of the decisions. Given this additional opportunity, Schreiber again affirmed McGhee's termination, showing conduct that a fact-finder could have determined reflected reckless disregard of dissimilar treatment based on age. "Where the employer . . . repeatedly fails to take effective action to stop the [discriminatory] conduct . . . the evidence is sufficient to support submission of punitive damages." *Diaz*, 484 S.W.3d at 89.

Here, "the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Alhalabi*, 300 S.W.3d at 529.

## B. Remittitur

Finally, as to Schreiber's claim that the trial court erred in failing to order a reduction in the award of punitive damages, "[s]ection 510.263.6 allows the trial court to order remittitur of punitive damages 'based on the trial judge's assessment of the totality of the surrounding circumstances.'" *Ellison v. O'Reilly Auto. Stores, Inc.*, 463 S.W.3d 426, 440 (Mo. App. W.D. 2015). "Generally, the decision to award punitive damages is peculiarly committed to the jury and the trial court's discretion, and the appellate court will only interfere in extreme cases." *Id*. (quoting *Smith*, 275 S.W.3d at 810). "On appellate review, an abuse of discretion is established when the punitive damages award is so disproportionate to the factors relevant to the size of the award that it reveals improper motives or a clear absence of the honest exercise of judgment."

*Id.* (quoting *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996)). "Only when the amount of punitive damages is manifestly unjust will an appellate court interfere with or reduce the size of the verdict." *Id.*

"No bright-line test exists to determine if a punitive-damage award is excessive." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 412 (Mo. App. E.D. 2014). But Missouri courts have developed a "nonexclusive list of factors to consider" in reviewing punitive damage awards:

> (1) the degree of malice or outrageousness of the defendants' conduct, which has been deemed a critical factor; (2) aggravating and mitigating circumstances; (3) the defendant's financial status, as an indication of the amount of damages necessary to punish the defendant; (4) the character of both parties; (5) the injury suffered; (6) the defendant's standing or intelligence; (7) the age of the injured party; and (8) the relationship between the two parties.

*Id.*

Here, the jury awarded $300,000 in compensatory and $350,000 in punitive damages. Schreiber's inequitable treatment of similarly situated employees in violation of the MHRA, which this court has held justifies punitive damages, also constitutes outrageous conduct (the "critical factor," *Blanks*, 450 S.W.3d at 412), as well as poor character. In Schreiber's favor, little evidence was presented as to its financial status. Moreover, McGhee is a convicted felon, who deliberately lied about this fact on his employment application with Schreiber. It appears that the jury took these factors into account, given the modest punitive damage award in comparison to the compensatory damages. Indeed, the punitive damages award, as a ratio to the compensatory damages, is exceptionally low when compared to other cases in which Missouri courts have upheld awards that were substantially more punitive. *See Diaz*, 484 S.W.3d at 89-90 (upholding $1,000,000 in punitive damages with $75,000 in compensatory damages in discrimination case); *Ellison*, 463 S.W.3d at 441 (upholding $2,000,000 in punitive damages with $200,000 in compensatory damages in discrimination case); *Bowolak*, 452 S.W.3d at 699 (upholding a punitive damages award of $500,001 with $50,000 in compensatory damages in

24

discrimination case); *Lynn v. TNT Logistics N. Am. Inc.*, 275 S.W.3d 304, 310 (Mo. App. W.D. 2008) (MHRA case where jury awarded $6.75 million in punitive damages, $50,000 in compensatory damages, trial court remitted the punitive damages to $450,000, and this court found the amount of remittitur to be abuse of discretion and increased the punitive damages award to $3.75 million).

Nothing here leads to the conclusion that this is an "extreme case," rendering the award "so disproportionate to the factors relevant to the size of the award" as to render the award "manifestly unjust." *Ellison*, 463 S.W.3d at 440. The $350,000 award accomplished the purposes of punitive damages and was related to the wrongful act. The trial court did not err in failing to order remittitur of the jury's punitive damages award.

Schreiber's fourth and fifth points are denied.

### Attorneys' Fees on Appeal

McGhee has filed a motion for attorneys' fees on appeal, which was taken with the case. "[T]rial courts are generally in a better position to take evidence and hear argument relating to attorney fees." *Diaz*, 484 S.W.3d at 95 (quoting *Claus v. Intrigue Hotels, LLC*, 328 S.W.3d 777, 789 (Mo. App. W.D. 2010)). We therefore remand to the trial court to make a determination as to a reasonable award of attorneys' fees on appeal.

### Conclusion

Finding no reversible error, we affirm the trial court's judgment. The case is remanded to the trial court with directions to conduct a hearing to determine a reasonable amount of attorneys' fees as requested by McGhee and to enter judgment accordingly.

_____
Karen King Mitchell, Presiding Judge

Cynthia L. Martin and Gary D. Witt, Judges, concur.

25