Cynthia L. Martin, Judge
Curtis Massood (“Massood”) appeals from a judgment reflecting the disposition of various claims following a jury trial, and reflecting the trial court’s disposition of a claim seeking to dissolve and wind-up the affairs of Midwest Outdoor Media, LLC (“Midwest”). Massood asserts that the trial court erred in entering judgment in favor of Midwest on a derivative claim for conversion asserted by member Craig Fedy-nich (“Fedynich”) because: (1) there was *53 insufficient evidence to support the jury’s verdict; (2) the jury’s verdict was inconsistent with the jury’s other verdicts; and (3) in the alternative, the trial court improperly instructed the jury regarding the calculation of damages. Massood also argues that the trial court erred in awarding Fed-ynich attorney’s fees on the derivative claim because the award was not statutorily permitted and included charges for work unrelated to the derivative claim. Finally, Massood asserts that the trial court erroneously ordered the dissolution and wind-up of Midwest based on a finding that the owners of Midwest are deadlocked. We affirm.
Factual and Procedural History[1]
In 2002, Fedynich controlled several undeveloped billboard locations in Missouri, based on existing leases, lease options, or easement options. Fedynich had procured or was prepared to procure the permits necessary to construct billboards on the locations. However, Fedynich did not have the necessary capital to construct the billboards. In July 2002, Fedynich approached Massood with a business proposal to form Midwest, a billboard business.
In forming Midwest, Fedynich and Mas-sood entered into an operating agreement (“Operating Agreement”) and a subscription agreement (“Subscription Agreement”) on July 12, 2002. The Operating Agreement provided that Massood and Fedynich were the sole members of Midwest, with Massood having a 51 percent ownership interest and Fedynich having a 49 percent ownership interest. The Operating Agreement also provided that profits and losses were to be allocated to Massood and Fedynich equally. The Subscription Agreement provided:
[Massood] shall have an initial member interest in [Midwest] in the amount of 51%. [Fedynich] shall have an initial member interest in [Midwest] in the amount of 49%. These member interests shall be in those percentages at any time that [Massood] shall be personal liability [sic] for any •of the liabilities of [Midwest] in excess of the personal liability of [Fedynich] for any of the liabilities of [Midwest]. At any time [Massood] shall not have personal liability for any of the liabilities of [Midwest] in excess of the personal liability of [Fedynich] for any of the liabilities of [Midwest], the membership interests of [Massood] and [Fed-ynich] shall be 50% each.
The Operating Agreement provided that Massood and Fedynich would each contribute $1,000 of capital to Midwest. In addition, the Subscription Agreement provided that Fedynich would provide ground leases and ground easements to Midwest or would provide easements sufficient to allow Midwest to construct billboards. The Subscription Agreement provided that Massood would loan Midwest the amount of $40,000 to construct each billboard but limited Massood’s total obligation to $500,000.
Fedynich contributed fourteen billboard locations to the company. Midwest purchased three additional billboard locations. Massood loaned Midwest a total of $554,339.54. By the end of 2005, Midwest had completed the construction of thirteen billboards. The four remaining billboard locations were still vacant as of June 2016.
According to both Fedynich and Mas-sood, their intention in forming Midwest was to build billboards on the contributed billboard locations, to rent each side of the *54 billboard to advertisers, and then to sell Midwest or its assets within a few years of the company’s formation. By late 2006, Massood and Fedynich both believed that Midwest had built and rented a sufficient number of billboards to permit Midwest or its assets to be sold for a sufficient amount to repay Massood’s loans, <to pay Fedynich for the value of the contributed billboard sites, and to result in profit to be split between the members. Over the course of 2006 and 2007, there were three offers to purchase Midwest’s billboards and locations. Massood received two offers that he declined without informing Fedynich, and Massood and Fedynich received one offer that Fedynich wanted to accept but .that Massood declined. „ ...
Massood and Fedynich met in September 2007 to discuss dividing Midwest’s assets, Fedynich .memorialized, their conversation in a handwritten document, signed by both Massood and Fedynich. Fedynich filed suit in 2008 against Massood and Midwest, arguing that the handwritten document was a contract to divide the company’s assets that should be specifically performed. On appeal, we concluded that “[b]ecause Mr. Fedynich failed ,to prove an enforceable contract to divide all of the assets of Midwest, the trial court should have entered judgment in' favor of [Massood and Midwest].” Fedynich v. Massood, 342 S.W.3d 887, 893 (Mo. App. W.D. 2011).
Meanwhile, in 2004, Midwest and Craig Outdoor Advertising, Inc. (“Craig”)[2] joined as plaintiffs in a lawsuit filed in federal court against Viacom Outdoor, Inc. (“Viacom”) (“Viacom suit”). The Viacom suit alleged that:
[Viacom and. its executives] perpetrated a-scheme by which Viacom and its employees and consultants would represent to businesses and individuals interested in constructing billboards on railroad property that Viacom was acting as the - agent for those railroads with respect to billboard construction and that applications to build on railroad property would be evaluated on a first-come, first-served basis. In reality, however, Viacom employees or consultants reviewed each site application to determine if Viacom wanted to develop the site itself.
Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1008 (8th Cir. 2008). Midwest and Craig were represented by the same attorneys in the Viacom suit. The suit was based on Midwest and Craig’s interests in three billboard sites, acquired from a company named Ad Trend, Two of the sites were owned jointly by Midwest and Craig, and the third site was solely owned by Midwest. Midwest’s interest in the three sites was acquired using $15,000 óf Massood’s personal funds.
Following a jury trial, judgment was entered in favor of Midwest and Craig in federal court; Following appeal and remand, the initial judgment was reduced. In January 2010, Midwest received a check for $776,372.25, which represented its share of the final judgment against Viacom minus attorney’s fees and expenses.[3] Mas-sood endorsed that check, and it was deposited into Midwest’s bank account. Then, Massood paid himself a total of $807,060.53 from Midwest, which represented the Viacom judgment plus amounts advanced by Massood to fund the Viacom litigation.
*55 Based on the reduction of the initial judgment in the Viacom suit, Midwest filed a legal malpractice suit in July 2010 against the attorneys who' represented Midwest and Craig (“malpractice suit”). Midwest settled the malpractice suit in May 2011. The settlement provided that Midwest was to be paid a total of $1,350,000, after attorney’s fees, in two installments of $675,000. Midwest received the first $675,000 check in June 2011 and received the second $675,000 check in January 2012. Massood deposited both checks directly into his personal account.
In May 2011, Massood filed suit against Fedynich claiming breach of fiduciary duty, breach of contract, and tortious interference in connection with the operation of Midwest. Massood’s suit also named Midwest, and sought declaratory judgments on several issues, including that the funds Massood gave Midwest to construct billboards were loans and not capital contributions, that Midwest properly distributed $807,060.53 to Massood following the Viacom judgment, and that Massood was entitled tó the $1,350,000 in proceeds from the malpractice suit settlement.
In September 2011, Fedynich filed suit against Massood alleging breach of fiduciary duty and breach of contract based on Midwest’s distribution of the Viacom judgment proceeds to Massood and based on Massood’s deposit of the malpractice settlement into his own account. Fedynich also sought a judgment ordering .dissolution and wind-up of Midwest. Finally, Fed-ynich filed a derivative action on behalf of Midwest against Massood for conversion of the malpractice settlement.
The trial court consolidated the cases. Thirteen claims were submitted to the jury, and Fedynich’s action to dissolve and wind-up Midwest was tried to the court. The claims submitted to the jury were disposed as follows: .
(1) On Massood’s claim for a declaratory judgment that the money -he contributed to Midwest to construct billboards were loans, the jury returned a verdict in Massood’s favor and found that from 2002 to 2003, Massood loaned Midwest $554,339.54.
(2) On Massood’s claim for a declaratory judgment setting the interest rate chargeable on the.loans made to Midwest, the jury returned a verdict declaring that Massood Was not entitled to interest on the loans he made to Midwest. ■ -
(3) On Massood’s claim for a declaratory judgment that he was entitled to the proceeds Midwest received from the Viacom suit, the jury returned a verdict declaring that “Massood is entitled to the entire amount' [Midwest] received from the Viacom litigation.”
(4) ' On Massood’s claim for a declaratory judgment that he'was entitled to the proceeds from the malpracticé suit settlement, the jury returned a verdict declaring that “Massood is not entitled to the entire amount [Midwest] received from the malpractice settlement”
(5) On Massood’s claim against Fedy-nich for breach of the ’ Subscription Agreement that asserted Fedynich failed to provide a sufficient number of ground leases and ground easements to allow Midwest to engage in its business activities, the jury returned a verdict in favor of Fedynich.
(6) On Massood’s claim, against Fedy-nich for breach of fiduciary duty alleging that Fedynich engaged in mismanagement of Midwest’s day-to-day affairs, the jury returned a verdict in favor of Fedynich.
(7) On Massood’s claim against Fedy-nich for breach of contract alleging that Fedynich mismanaged Midwest’s day-to *56 day affairs, the jury returned a verdict in favor, of - Fedynich.
(8)' On Massood’s claim against Fedy-nich for tortious interference with a brokerage agreement Midwest entered into with a company that regarding a sale of Midwest’s assets, the jury returned a verdict in favor of Fedynich.
(9) ■. On Fedynich’s claim against Mas-sood for.'breach'of fiduciary duty regarding Massood’s distribution of the proceeds from the Viacom suit from Midwest to himself, the jury returned a verdict in favor of Massood.
(10) On Fedynich’s claim against Mas-sood for breach of contract for failing to distribute the proceeds from the Viacom suit in accordance with the Operating Agreement, the jury returned a verdict in favor of Massood.
(11) On Fedynich’s claim against Mas-sood for breach of fiduciary duty regarding Massood’s deposit of the malpractice settlement into his personal account, the jury returned a verdict in favor of Mas-sood.
(12) On Fedynich’s claim against Mas-sood for breach of contract for failing to distribute the proceeds from the malpractice suit settlement in accordance with the Operating Agreement, the jury returned a verdict in favor of Massood.
, (13) On Midwest’s claim asserted derivatively by Fedynich against Massood for conversion of the proceeds from the malpractice suit settlement, the jury returned a verdict in favor of Midwest in the amount of $1,350,000.
The trial court entered a judgment (“Judgment”) in accordance with these jury verdicts. In accordance with section 347.175,[4] which permits the trial court to award reasonable attorney’s fees and expenses to a plaintiff if a derivative action is successful, the Judgment awarded Fedynich reasonable attorney’s fees and expenses in the amount of $291,668.75. The Judgment also resolved Fedynich’s bench-tried claim to dissolve and wind-up Midwest by ordering the dissolution of Midwest and appointing a receiver “to conduct the winding down of [Midwest] and distribute the remaining assets, if any, to Craig Fedynich and Curtis Massood.”
Massood appeals, challenging only the judgment' on Midwest’s claim for conversion asserted derivatively by Fedynich, the award of attorney’s fees to Fedynich, and the judgment ordering dissolution and wind-up of Midwest.
Analysis
Massood presents five points on appeal. First, he asserts that the trial court erred in entering judgment in favor of Midwest on the derivative conversion claim because there was no probative evidence admitted at trial to conclude that Massood and Fed-ynich had not agreed that Massood was entitled to all recovery obtained by Midwest in connection with the Viacom suit. Second, Massood argues that the trial court erred in entering judgment in favor of Midwest on the derivative conversion claim because that verdict was inconsistent with the jury’s verdict declaring that Mas-sood was entitled to distribution from Midwest of the proceeds from the Viacom suit. Third, Massood claims that, in the alternative to Points 1 and 2, the trial court erred in entering judgment in favor of Midwest in the amount of $1,350,000 for the derivative conversion claim because the amount of the verdict resulted from instructional error. Fourth, Massood argues that the trial court’s award of attorney’s fees constituted error because section 347.175 does not authorize an award of attorney’s fees *57 on-a derivative claim brought by one; member against another member of a limited liability company, and because the award included charges for work unrelated to the derivative conversion claim. Finally, Mas-sood claims that the trial court erred in ordering the dissolution and wind-up of Midwest because there was no deadlock among the owners as Massood owned 51% of the membership interest. We discuss these points separately.

Point One: Sufficiency of the Evidence to Support the Derivative Conversion Verdict

Massood’s first point ori appeal argues that there was insufficient evidence to support the verdict in favor of Midwest on the derivative conversion claim. We “ ‘will reverse the jury’s verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury’s conclusion.’ ” McGhee v. Schreiber Foods, Inc., 502 S.W.3d 658, 666 (Mo. App. W.D. 2016) (quoting Smith v. Brown & Williamson Tobacco Corp., 410 S.W.3d 623, 630 (Mo. banc 2013)). In considering whether there is a complete absence of probative fact to support the jury’s conclusion, “ ‘[w]e view the evidence in the light most favorable to the jury’s verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict.’ ” Id. (quoting Hurst v. Kansas City, Mo. Sch. Dist., 437 S.W.3d 327, 336 (Mo. App. W.D. 2014)).
“ ‘Conversion is the unauthorized assumption of the right of ownership over personal property of another to the exclusion of the owner’s rights.’’’ Herron v. Barnard, 390 S.W.3d 901, 908 (Mo. App. W.D. 2013) (quoting Hunt v. Estate of Hunt, 348 S.W.3d 103, 113 (Mo. App. W.D. 2011)). Conversion requires proof of three elements: “(1) the plaintiff ‘owned the property or was entitled to possess it; (2) the defendant took possession of the property .with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession.’ ” Id. at 909 (quoting Hunt, 348 S.W.3d at 113). As the plaintiff, Fedynich, on behalf of Midwest, was required to prove that Midwest owned or was entitled to possess the proceeds from the malpractice settlement, that Massood took those proceeds with the intent to exercise some control over them, and that Massood thereby deprived Midwest of the right to possess those proceeds. At. issue here is the first element—-who was entitled to possess the proceeds from the malpractice settlement.
Massood argues that there was no probative evidence to support the finding that Massood and Fedynich had not agreed that Massood was entitled to all recovery obtained by Midwest in connection with the Viacom litigation. Massood asserts that evidence he presented to the jury established that Massood and Fedynich made an oral agreement in an October 26, 2006 conversation as to their respective rights to recovery in the Viacom litigation. A recording and a transcript of that conversation was entered into evidence.
During that conversation, Massood stated:
Well, on our deal, here’s basically how the numbers come out. After lawyer’s fees,-after all the BS, it’s 3.8 million, give or take, probably "50 grand either way. 3.8 million for the two of us to split. Now, that’s 1.9 for Craig Outdoor. 1.9 for Midwest, .and the Midwest stuff I keep, the Craig Outdoor stuff.it keeps, and everybody goes home, but we need to put that in writing, Craig, and I want to do it before the 7th so that everybody is clear about what is going on. So when do you want-to get together and 'uh do that?
*58 Fedynich responded: “Well, 1⅛ going to shoot for some time' next week, and I’m going to try to find me a lawyer and get started making phone calls tomorrow.” Then, in response to Massood’s question about what the lawyer would be doing, Fedynich clarified that he would search for a lawyer to draw up - a living will for him. Massood then asked whether Fedynich wanted “a lawyer to draw up our agreement on the 1.9 million each.”-Fedynich responded, “You know what? I might want to have the same guy wrap up everything.” Massood then stated, “That’s fine with me.” Massood and Fedynich then discussed about which lawyer would draw up the agreement. Despite this conversation, no such agreement was ever memorialized in a written contract.
Massood’s position ⅛ that his October 26, 2006 conversation with Fedynich established their agreement that Massood-was entitled to all of Midwest’s proceeds from the Viacom suit, a position with which the jury -apparently agreed, as it found in favor of Massood on his claim that he was entitled to the distribution he received from Midwest of -the Viacom judgment proceeds. Massood’s further position is that his October 26, 2006 conversation with Fedynich established their agreement that Massood was also entitled to Midwest’s proceeds from the malpractice settlement. But plainly, the 2006 conversation could not have been addressing the malpractice settlement, as Midwest did not even file the malpractice suit until 2011. .
The . essence of Massood’s argument is that because the malpractice settlement arose out of the reduced judgment Midwest received in the Viacom suit, it should naturally follow that any agreement regarding Massood’s entitlement to the Viacom suit proceeds should., extend. to ■ the later filed malpractice suit. We disagree. Because the 2006 agreement did not by its plain terms address or contemplate a malpractice suit filed five years later, we reject Massood’s argument that the agreement deprived the jury of any probative evidence supporting its judgment in favor of Midwest on the derivative conversion claim. "
In addition, Massood’s-argument misapprehends the derivative conversion claim. Fedynich, as the plaintiff acting on behalf of Midwest, was required to prove that Midwest was first entitled to the proceeds from the malpractice settlement. The jury heard evidence that Midwest, a limited liability company distinct from Massood and Fedynich in .their individual capacities, was the plaintiff in the malpractice suit; that the 'malpractice claim arose out of a reduction ■ in the recovery Midwest -received by judgment in the Viacom suit; and that Midwest thus owned the proceeds from the settlement of the malpractice suit. Yet the two checks in the respective amounts of $675,000 which Midwest received were not deposited into Midwest’s account. Rather, Massood deposited the checks into his personal account. There was sufficient probative evidence for the jury to conclude that Midwest owned or was entitled to possess the proceeds from the malpractice settlement, that Massood took those proceeds with the intent to exercise some control -over them, and that Massood thereby deprived Midwest of the right to possess -those proceeds,
Massood’s argument that an agreement existed between Massood and Fedy-nich regarding who would receive Midwest’s proceeds from the Viacom suit, and that the agreement should be interpreted to cover the malpractice settlement, is irrelevant to whether. Massood converted property that belonged to Midwest, Here, it is uncontested that Massood converted the proceeds of the malpractice.proceeds before Midwest ever took possession of the *59 proceeds from the malpractice settlement. Determining who was ultimately entitled to distribution of the malpractice settlement proceeds from Midwest is not. relevant to determining Massood’s liability to Midwest for conversion. In fact, on this point, it is noteworthy that on Massood’s claim for a declaratory judgment that he was entitled to the proceeds from the malpractice suit settlement, the jury returned a verdict declaring that “Massood' is not entitled to the entire amount [Midwest] received from the malpractice settlement.” Massood has not appealed this judgment.[5]
Massood’s first point on appeal is denied.

Point Two: Inconsistent Jury Verdicts

Massood’s second point on appeal complains - that the trial court erred in entering a judgment in favor of Midwest for the derivative conversion claim because that verdict was inconsistent with the jury’s verdict declaring that Massood was entitled to distribution from Midwest of the proceeds from the Viacom suit and was inconsistent with the jury’s verdict concluding that Massood did not violate contractual or .fiduciary duties.owed to:Fedy-nieh in taking a distribution of the Viacom suit proceeds from Midwest. Massood’s argument is without merit.
Wé have already explained that on Mas-sood’s claim seeking a declaratory judgment that he was' entitled to the proceeds. from the malpractice settlement, the jury returned' a verdict declaring that “Massood is not entitled to the entire amount [Midwest] received from the malpractice settlement.” Massood has. not appealed this judgment.[6] In short, though the jury found Massóod was entitled to distribution from Midwest of the entirety of the Viacom judgment, the jury did not agree that Mas-sood was entitled to the entirety of the malpractice settlement. Plainly, the jury’s verdict finding that Massood converted Midwest’s property—the malpractice settlement proceeds—by depositing those proceeds directly into his personal account is not inconsistent. .
Moreover, Massood failed to preserve any issue with respect to inconsistent verdicts for appellate review. “ ‘[T]he general rule is that an objection to inconsistency in verdicts must be made before *60 the jury is discharged. If such an objection is not made at this time- the error is deemed waived.’” Day Advert., Inc. v. Devries & Assocs., P.C., 217 S.W.3d 362, 368 (Mo. App. W.D. 2007) (quoting City of Independence v. Kerr Constr. Paving Co., 957 S.W.2d 315, 319-20 (Mo. App. W.D. 1997)). This rule was first adopted by our Supreme Court in Douglass v. Safire, 712 S.W.2d 373 (Mo. banc 1986). The Court explained the reasoning behind its decision:
[I]f the point is raised as soon as the verdict is returned, any error is capable of correction by ordering .the jury to return for further deliberation. Our holding is in accord with the usual rule that the trial court must be given the opportunity to correct error while correction is still possible.
Id. at 374.
When the jury indicated that it. had reached verdicts, the trial court said in open court:
It would be my intention, when the jurors come down that I will review the verdict forms, going to probably take me a little while so be patient to make sure that it appears to be consistent. If it appears to be consistent, when [sic] I will read the verdict forms. If not, I’ll probably call you up here and then see how we’d like to proceed.
[[Image here]]
If it appears to be consistent, and I read it, and you decide it’s inconsistent, and you want the jury to be excused, assuming there’s no punitive stage, please let me know, and ask to approach and. we’ll deal with it.
The trial court briefly went, off the record before reading the verdicts aloud. After the trial court finished reading the verdicts, it asked: “Any reason why the Court cannot accept Verdicts A through H as read in open court ... ?” Massood and Fedynich both replied, “No, Your Honor.” The trial court then asked, “May then I discharge this jury from their service?” Massood and Fedynich both replied affirmatively. The trial court discharged the jury.
Despite the trial court warning Massood and Fedynich that, if either believed the verdicts to be inconsistent, they should approach the bench, Massood did not do so before the jury was discharged. Rather than approach the bench to lodge his complaint'with the verdicts when prompted by the trial court, Massood told the trial court that there was no reason that the trial court could not accept the verdicts and agreed that the jury should be discharged. Massood waived his complaint regarding an alleged inconsistency between the jury’s verdicts.
Massood’s second point on appeal is denied.

Point Three: Instructional Error as to Damage Award for Derivative Conversion Claim

Massood’s third point on appeal argues that, in the alternative to points one and two on appeal, the trial court erred in entering judgment in favor of Midwest in the amount of $1,350,000 on the. derivative conversion claim because that verdict resulted from instructional error. Massood argues that Instruction No. 48 was improper in that it required the jury to award a fixed sum of $1,350,000 to Midwest if it found in favor of Midwest on the derivative conversion claim. Massood claims that the jury should have been able to determine the extent, if any, to which Midwest was damaged by the conversion and to craft its own damage award accordingly.
During the instruction conference, Massood objected to Instruction No. 48 on the basis that it did not allow the jury to *61 determine how Midwest was damaged by the conversion of the proceeds from the malpractice settlement. Massood’s attorney argued:
I see a situation where the jury might want to feel that under the previous agreement between Curtis Massood, Midwest, and Mr. Fedynich, that it was supposed to be 50/50, and that somehow Curtis got this and maybe Mr. Fedynich should have shared in it, and then 50 percent should come back to the company, not the entire amount. And I think this amount eliminates it, I mean, and— in that they could determine that he was converted—a portion of those checks were Midwest checks or proceeds and a portion were Mr. Massood’s. And I think by stipulating to a damage amount, that raises that issue.
The trial court overruled the objection and gave Instruction 48 to the jury. The instruction read: “If you find in favor of Midwest Outdoor Media, LLC, on its claim against Curtis Massood for conversion of two malpractice settlement checks, then you must award Midwest Outdoor Media, LLC, $1,350,000.00.” In his motion for new trial, Massood again argued that Instruction No. 48 deprived the jury of the opportunity to determine the extent, if any, Midwest was damaged by the conversion of the checks from the malpractice settlement. This issue is thus preserved for our review. See Koppe v. Campbell, 318 S.W.3d 233, 243 (Mo. App. W.D. 2010) (“In order to preserve claims of instructional error for review, counsel is required to make specific objections to the instruction at trial and again raise the error in the motion for new trial.”).
Whether the trial court properly instructed the jury is a question of law that we review de novo. Hervey v. Mo. Dep’t of Corrections, 379 S.W.3d 156, 159 (Mo. banc 2012). “Review is conducted in the light most favorable to the record and, if the instruction is supported by any theory, its submission is proper.” Id. “To reverse on grounds of instructional error, the party claiming instructional error must establish that the instruction at issue misdirected, mislead [sic], or confused the jury.” Sorrell v. Norfolk S. Ry. Co., 249 S.W.3d 207, 209 (Mo. banc 2008). Instructional error will result in reversal only if the error resulted in prejudice that materially affected the merits of the action. Hervey, 379 S.W.3d at 159.
Key to Massood’s third point on appeal is his contention that he was ultimately entitled to all of the proceeds from Midwest’s malpractice settlement. We have already explained that the jury specifically rejected this claim, finding that “Massood is not entitled to the entire amount [Midwest] received from the malpractice settlement” in addressing Massood’s claim for a declaratory judgment that he was entitled to the proceeds from the malpractice suit settlement.[7] Massood did not present a claim to the jury asking for a declaration that he was entitled to less than all of the malpractice settlement, or asking the jury to determine the extent to which he was entitled to a distribution from Midwest of a portion of the malpractice settlement.[8] Thus, the premise inherent in Massood’s third point on appeal is not borne out by the record.
Moreover, as we explained in our discussion of .Point One, supm, the issue in the derivative conversion claim was which entity or person was initially entitled to possess the two $675,000 checks represent *62 ing the ^proceedings from the Midwest’s malpractice suit. The jury concluded that Midwest, as the owner of the malpractice suit, owned the two $675,000 checks and that Massood converted those two checks. “ ‘The recognized measure of damages for conversion of an identifiable check is prima facie the value of the paper converted.’” Moore Equip. Co. v. Callen Const. Co., 299 S.W.3d 678, 681 (Mo. App. W.D. 2009) (quoting K-Smith Truck Lines, Inc. v. Coffman, 770 S.W.2d, 393, 399 (Mo. App. E.D. 1989)). Instruction No. -48 reflected this recognized measure of damages. The trial court did not err, in instructing the jury as such.
Massood’s third point on appeal is denied.

Point Four: Award of Attorney’s Fees

In his fourth point on appeal, Massood argues that the trial court erred in awarding Fedynich attorney’s fees in the amount of $291,668.75. First, Massood contends that this award was erroneous because the rationale underlying section 347.175 is inapplicable to the derivative conversion claim. Second, Massood asserts that the trial court’s award is grossly excessive because it included reimbursement for attorney’s fees expended to litigate claims that were wholly unrelated to the derivative conversion claim. We note that Massood’s fourth point relied on is multifarious in, that it asserts two distinct bases of error for the trial court’s- award of attorney’s fees. See McLean v. First Horizon Home Loan Corp., 369 S.W.3d 794, 800 (Mo. App. W.D. 2012) (deeming a point relied on that raised three challenges to the trial court’s award of attorney’s fees multifarious). Nonetheless, we have elected to address Massood’s distinct claims of error, ex gra-tia.
Massood’s first complaint is that the award of attorney’s fees does not comply with the rationale underlying section 347.175. Massood claims that “[t]he rationale behind the discretionary power to award attorney [sic] fees conveyed by R.S.Mo. [section] 347.175 stems from the notion that the individual pursuing a derivative claim reaps benefits for others and not exclusively for himself or herself.” [Appellant’s Brief, p. 43] “We review a claim that the court erroneously declared or applied the law de novo.” Randall v. Randall, 497 S.W.3d 850, 854 (Mo. App. W.D. 2016).
. Section 347.175 provides:'
If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney’s fees, and shall direct him to remit to the limited liability company the remainder of those proceeds received by him.
The'plain language of this statute grants the' trial court discretion to award reasonable expenses, including attorney’s fees, to a plaintiff'in a derivative action who is successful in whole ór'in part. ■ That' is precisely what the trial court did. Mas-sood’s argument contradicts the plain and unambiguous language of section 347.175. “In construing a statute, courts cannot ‘add statutory language where it does not exist’; rather, courts must interpret ‘the statutory language as written by the legislature.’ ” Peters v. Wady Indus., Inc., 489 S.W.3d 784, 792 (Mo. banc 2016) (quoting Frye v. Levy, 440 S.W.3d 405, 424 (Mo. banc 2014)). We will not read a limitation into a statute that the legislature did not include.
More to the point, Fedynich did not recover anything by virtue of the successful derivative action. Midwest did. It remains to be determined the extent to *63 which, at all, Fedynich is entitled to distribution from Midwest of all or any portion of the malpractice settlement—a determination that will no doubt be made in connection with the-dissolution and wind-up of Midwest ordered by the trial court. - -
Massood’s second complaint is that the award of attorney’s fees included reimbursement for expenses wholly unrelated to the derivative conversion claim. “The trial court is considered an expert on fees, given its familiarity with all of the issues in the case and with the character of the legal services rendered.” Soto v. Costco Wholesale Corp., 502 S.W.3d 38, 55 (Mo. App. W.D. 2016). Thus, we review the trial court’s award of reasonable attorney’s fees for abuse of discretion. Id. We will reverse only if the-complainant proves “that the award of attorneys fees was against the logic of the circumstances and was so arbitrary and -unreasonable as to shock .our sense of justice.” Id. .. .
While Massood argues that the trial court awarded attorney’s fees to reimburse for work unrelated to- the derivative conversion claim, Massood points to no specific charges incurred that he believes should not have been reimbursed. Instead, he argues more generally:
For example, whether Fedynich breached his fiduciary or contractual duties in conducting day to day [sic] operations of Midwest has no connection whatsoever to any issue presented in the derivative claim. The same is true of the claims related to Fedynich’s alleged tortious interference with the brokerage contract between Midwest and Kali. Yet all of the work incurred by Fedynich’s attorneys to prepare for and defend against those claims in the trial of the consolidated eases is included in the $291,668.75 fee award.
[Appellant’s Brief, p. 44]
Fedynich argued in his motion for attorney’s fees that all of Fedynich’s claims against Massood, including the derivative conversion claim, had a common core of facts, and that much of counsel’s time was dedicated to; the litigation as a whole. “[I]f the claims for relief have a common core of facts and are based on related legal theories and much of counsel’s time is devoted generally to the litigation as a whole making it difficult to divide the hours expended on a claim-by-claim basis,, such a lawsuit cannot be viewed as a series of distinct claims.” Williams v. Fin. Plaza, Inc., 78 S.W.3d 175, 185 (Mo. App. W.D. 2002). The trial court, did not abuse its discretion in accepting Fedynich’s. contention that the work completed by Fedy-nich’s attorneys was dedicated to the litigation as a whole. ,,
' Massood’s fourth point on appeal is denied.

Point Five: Deadlock Among Owners of Midwest

In his fifth point on appeal, Mas-sood argues that the' trial court erred in entering a judgment ordering the dissolution and -wind-up of Midwest. Massood asserts that/contrary to "the trial court’s finding, the owners of Midwést "are not deadlocked- because Massood holds a 51 percent ownership interest in" Midwest. Massood contends: “Absent a deadlock- or some actionable malfeasance committed by the holder of a majority of the membership interests, the holder, of that majority interests [sic] has the right-to control the business.” [Appellant’s Brief, p. 46]
The standard of review in an equitable action, like-one tó dissolve'a limited liability company, is'the same as that for any court-tried case: '-“we will sustain the trial court’s judgment unless there is no substantial evidence to ■ support it,' it is against the weight of the evidence, or it erroneously states or applies the law.” *64 Cannon v. Monroe, 285 S.W.3d 375, 381 (Mo. App. E.D. 2009).
Here, the trial court relied on section 347.143.2 as the basis for' dissolving Midwest. Section 347.143.2 provides:
On application by or for a member, the circuit court for the county in which the registered office of the limited liability ' company is located may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the operating agreement.
The trial court examined the Operating Agreement and Subscription Agreement, and subsequently found that those documents provide that Massood and Fedynich each have a 50 percent interest in Midwest. The trial court also found that Mas-sood had failed to carry out his duties as manager of Midwest, and that there had been years of litigation between Massood and Fedynich regarding disputes involving the operation of Midwest. Based on. these collective findings, the trial court concluded that management of Midwest is deadlocked such that Midwest is unable to carry on its business in conformity with the operating agreement.
Massood’s fifth point on appeal challenges only the trial court’s finding that Massood and Fedynich each held a 50 percent ■ interest in Midwest. Substantial evidence. supports the trial court’s conclusion. Although the Operating Agreement provides that Massood had a 51 percent interest in Midwest while Fedynich had a 49 percent interest of Midwest, the Subscription Agreement provides that if, “[a]t any time [Massood] shall, not have personal liability for any of the liabilities of [Midwest] in excess of the personal, liability of [Fedynich] for any, of the liabilities of [Midwest], the membership interests of [Massood] and [Fedynich] shall be 50% each.” There was no evidence in the record suggesting that Massood had personal liability for the liabilities of Midwest in excess of Fedynich’s personal liability.- In fact, the Operating Agreement specifies that Massood and Fedynich are each personally liable for 50 percent of Midwest’s liabilities.
Regardless, even assuming Mas-sood’s argument that he held a 51 percent membership interest in Midwest is debatable, section 347.143.2 does not require a voting deadlock as a condition to ordering dissolution and wind-up of a limited liability company. It requires only that the court find it is. not reasonably practicable to carry on the business of the limited liability company in conformity with the operating agreement. Here, the trial court found that Massood had not carried out his duties as the manager of Midwest, and that the members of Midwest had been embroiled in years of litigation regarding the operation of Midwest. These findings are not contested by Massood on appeal, and are sufficient standing alone to support the trial court’s judgment ordering the dissolution and wind-up of Midwest.
Massood’s fifth point on appeal is denied.
Conclusion
The trial court’s Judgment is affirmed.
All concur.

. We view the facts in the light most favorable to the jury’s verdicts. Host v. BNSF Ry. Co., 460 S.W.3d 87, 94 n. 2 (Mo. App. W.D. 2015).

. Craig Outdoor Advertising, Inc. was Fedy-nich’s wholly owned billboard company.

. Craig received a check for $699,569.99, .which represented its share of the final judgment against Viacom less attorney's fees and expenses, The payment to Craig is not at issue . in this case,

. All statutory references are to RSMo 2016 unless otherwise indicated.

. Massood claimed during oral argument that he has appealed the verdict seeking a declaration involving his entitlement to the malpractice proceeds-. Massood pointed to page 4 of , his brief, which states: "Certain of the issues resolved in the unappealed judgments have an impact on Massood’s appeal of the judgment entered on the jury verdicts listed below as number 4 and 13,” Massood also argued that his second point relied on referred to "verdicts,” which made clear that his intention was to appeal the verdicts rendered on both Counts 4 and 13. We'disagree.
Rule 84.04(d)(1) requires each point relied on to "[ijdentify the trial court ruling or action that the appellant challenges.” "The purpose of the rule is to provide the opposing party with notice as to the precise matters that must be contended with and to inform the court of the legal issues' presented for review,” Osthus v. Countrylane Woods II Homeowners Ass'n, 389 S.W.3d 712, 715 (Mo. App. E.D. 2012), While Massood’s brief references "verdicts” in its second point relied on, neither that point relied on nor the other two points. relied on concerning the derivative conversion claim specifically reference the judgment declaring that Massood is not entitled to the entire amount of the malpractice settlement. Instead, the points relied on and subsequent arguments speak only in terms of the "derivative conversion claim.” Even were we to overlook this point, Massood advances no argument that the jury was without evidence sufficient to support its verdict declaring he was not entitled to the entire amount of the malpractice award, except the argument that a purported October 2006 agreement between he and Fedynich covered the malpractice award. We'explain in the Opinion why we disagree w.ith Massood on this point.

. See supra note 5,

. See supra note 5.

. Presumably, this calculation will be part and parcel of the dissolution and wind-up proceedings for Midwest.