

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| RONELL JOHNSON, | ) | No. ED107679 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Bryan L. Hettenbach |
| CITY OF ST. LOUIS, MISSOURI, et al., | ) | |
| | ) | |
| Respondents. | ) | FILED: June 23, 2020 |

## Introduction

Ronell Johnson ("Johnson") appeals from the trial court's judgment entering a directed verdict in favor of Lieutenant Colonel Lawrence O'Toole ("Lt. Col. O'Toole") and the trial court's judgment for the City of St. Louis, Missouri ("the City"), Lieutenant Scott Gardner ("Lt. Gardner"), and Chief Sam Dotson ("Chief Dotson") (collectively, "Respondents") on Johnson's claims of race discrimination, disability discrimination, and retaliation following a jury trial. In his first of four points on appeal, Johnson challenges the trial court's ruling rejecting Johnson's objection to Respondents' characterizations during closing argument as to the standard for proving Johnson's claims of race and disability discrimination and retaliation. In his second point, Johnson contends that the trial court erred when it entered a directed verdict in favor of Lt. Col. O'Toole because Johnson presented evidence that Lt. Col. O'Toole was an employer within the meaning of the Missouri Human Rights Act ("the MHRA"), and that Johnson's race was a contributing factor in Lt. Col. O'Toole's decision to sign off on a recommendation that Johnson

be terminated.  In his third point, Johnson argues the trial court abused its discretion in excluding administrative memos constituting comparator evidence concerning white police officers. Finally, Johnson alleges the trial court erred in refusing to submit the issue of punitive damages to the jury.

First, although the trial court erred in overruling Johnson's objection to the portion of Respondents' closing argument relating to the standard for proving discrimination and retaliation, we find no prejudice to Johnson because the trial court properly instructed the jury as to the evidence required to prove a claim of discrimination or retaliation.  Regarding the trial court's entry of a directed verdict in favor of Lt. Col. O'Toole on Johnson's claim of race discrimination, we will not reverse because we cannot ascertain any prejudice to Johnson in light of the jury's verdicts rejecting Johnson's claims of discrimination against the other Respondents. Third, the trial court did not abuse its discretion in excluding the administrative memos as comparator evidence because such memos were cumulative of evidence that was introduced through live testimony.  Finally, Johnson's final point on appeal relating to punitive damages is moot given our denial of his first three points.  Accordingly, we affirm the judgment of the trial court.

Factual and Procedural History

This case arises out of an incident on June 25, 2013.  On that day, Johnson, an African-American police officer having the rank of Lieutenant with the St. Louis Metropolitan Police Department ("SLMPD)", was stopped and arrested on suspicion of driving while intoxicated. Internal Affairs ("IA") investigated Johnson and charged Johnson with conduct unbecoming of an officer for driving while intoxicated and false reporting of his behavior during the investigation.  Johnson was terminated when the charges were sustained following the investigation.

In the early hours of June 25, 2013, Trooper Barbara Collins ("Trooper Collins") of the Missouri State Highway Patrol stopped Johnson's car on suspicion of driving while intoxicated, failing to drive in a single lane, and failing to yield to an emergency vehicle. Trooper Collins called additional troopers to the scene. Johnson alleged that when he was standing on the side of the road he overheard one of the troopers say, "we're gonna book this [n_ _ _ _ _r]." The troopers arrested Johnson.

Johnson was taken to the Maryland Heights Police Department where he was interviewed by Sergeant Lisa Albright ("Sgt. Albright") of the SLMPD's IA division. Johnson told Sgt. Albright that he could not remember what happened that night but did remember having a drink at a bar. Sgt. Albright later testified that Johnson was not slurring during the interview but that his speech was slow and that he smelled faintly of alcohol. Johnson's account of where he had been throughout the night varied as the investigation continued.

Johnson testified that at one point while being investigated he told Lt. Gardner, who was commander of IA at the time of Johnson's arrest, about the trooper's use of a racial slur during his arrest, at which point Lt. Gardner "became agitated." Johnson also testified that he raised concerns about the accuracy of the highway patrol's report, specifically alleging that the report inaccurately stated that he failed to perform certain sobriety tests and was slurring his speech.

Johnson testified that he had been diagnosed with sleep apnea eight to ten years prior, and that he started having trouble sleeping around late 2012 or 2013. Johnson stated that he would go days without sleeping around June 2013 and would forget things. Following his arrest, Johnson contacted his doctor, who subsequently diagnosed Johnson with narcolepsy. Johnson informed IA about his narcolepsy diagnosis. Johnson later informed Sgt. Albright of his sleep apnea as well.

Sgt. Albright concluded that Johnson had three-to-four drinks over a five-and-a-half-hour period prior to his arrest. Lt. Gardner produced an administrative memo recommending Johnson's termination for conduct unbecoming of an officer for driving while intoxicated and false reporting as a result of lying to IA about his drinking prior to his arrest. Lt. Gardner, Lt. Col. O'Toole, and Chief Dotson all signed the memo recommending termination, although the decision to terminate Johnson belonged only to Chief Dotson.

Johnson filed suit against Respondents alleging discrimination based upon race and disability, and also alleging retaliation. Johnson's disability claims related to his narcolepsy and sleep apnea. Johnson's claim of retaliation was premised upon his report to IA of the racial slur allegedly made during his arrest. The case proceeded to a jury trial.

Johnson called Lieutenant Anthonette Madison ("Lt. Madison"). Lt. Madison testified generally that race relations in the department are extremely poor, that discipline is affected by race, and that officers of color are charged differently than white officers. Lt. Madison also testified more specifically about an exchange she had with Lt. Col. O'Toole. Lt. Madison testified that Lt. Col. O'Toole once said, "well, if you see two black men in my - - in the alley in my neighborhood, you'd better stop them." Lt. Madison testified that she responded, "are you saying that black people can't live in your neighborhood?" According to Lt. Madison, Lt. Col. O'Toole responded, "well they don't," which she understood to be Lt. Col. O'Toole saying black people could not live in his neighborhood.

Johnson also called Lt. Col. O'Toole. Lt. Col. O'Toole denied making the statements alleged by Lt. Madison. Lt. Col. O'Toole acknowledged he made the statement that police had "owned the night" following the protests of the acquittal of former police officer Jason Stockley. Lt. Col. O'Toole was the acting chief of police at the time.

4

Upon calling Chief Dotson to testify, Johnson moved to admit into evidence the IA administrative memos relating to white police officers who had been investigated by IA, who had been charged with one or both of false reporting and conduct unbecoming of an officer, and who had been disciplined by Chief Dotson. The memos contained the names of the officers, their ranks, their charges, the facts underlying their charges, and the discipline imposed. Respondents objected to the admission of the written memos, arguing that the memos contained hearsay and hearsay within hearsay. Johnson maintained that the relevant issue relating to the memos was Chief Dotson's reliance on the memos, and not the truthfulness of their contents. The trial court sustained the hearsay within hearsay objection and excluded the memos but affirmatively stated that Johnson could ask Chief Dotson "anything about anything in the[] documents[.]" Johnson then questioned Chief Dotson at length about the other officers named in the memos, including the circumstances leading to the decision to discipline the officers, and the discipline administered by Chief Dotson.

Chief Dotson then testified that race and disability were not factors in his decision to terminate Johnson but that he terminated Johnson because of Johnson's rank as a lieutenant and his belief that Johnson had repeatedly and intentionally lied to IA.

At the close of Johnson's case-in-chief, Respondents moved for a directed verdict in favor of each Respondent on all counts. Respondents Lt. Gardner and Lt. Col. O'Toole maintained that their recommendations to terminate Johnson did not constitute adverse employment actions under the MHRA. The trial court queried how Lt. Col. O'Toole's actions were anything more than a signature. The trial court denied the motions for directed verdict, but indicated it would reconsider the motions following the close of all the evidence. Following the close of all evidence, the trial court denied directed verdicts in favor of the City, Lt. Gardner, and

5

Chief Dotson, but granted a directed verdict on all counts in favor of Lt. Col. O'Toole. The trial court did not explain its rulings.

The trial court declined to submit the issue of punitive damages to the jury and the case proceeded to closing arguments.

Respondents repeatedly addressed the causation standard for liability for claims of race discrimination, disability discrimination, and retaliation during closing argument. Respondents initially characterized the standard for retaliation claims multiple times without drawing any objection from Johnson. For example, Respondents stated:

> Finding a verdict in favor of the [Respondents], this is what you must believe. That somehow, some way, [Johnson's] complaint of discrimination was contributing to the decision to fire him.[1]

And:

> If you think, if you agree that his complaint of discrimination that, hey, someone from the highway patrol used a slur that had nothing to do with why he was fired, then your verdict should be for the defendants on all of the retaliation claims.

Respondents also made similar statements about race and disability discrimination without objection and repeatedly told the jurors that they should follow the verdict directors.

However, Respondents went on to say:

> Again, the instructions, when you read them, will demonstrate to you that you have to believe -- in order to find a verdict for the plaintiff, you have to believe that race was the reason for the decision. Or disability was the reason for the decision. Or retaliation was the reason for the decision.

At this point, Johnson objected that Respondents were misstating the contributing factor causation standard. The trial court responded, "That's overruled. It's final argument. You'll have an opportunity to respond." Respondents continued to characterize the causation standard

---

[1] Respondents evidently misspoke and meant to say that the jury must believe that Johnson's complaint of discrimination was a contributing factor in Johnson's termination in order to find in favor of Johnson.

as whether Johnson's race, disability, or complaints of discrimination were "the reason" for his termination. During rebuttal, Johnson described the causation standard as being whether race or disability were contributing factors and clarified that neither race nor disability had to be "the reason" for Johnson's termination.

The trial court informed the jury that the jury instructions "constitute the law of this case" and that the jury should find for Johnson on each claim if his race, disability, or complaints of discrimination were a "contributing factor" in either the substantiation of the charges against Johnson, the recommendation that Johnson be terminated, or Johnson's termination. Shortly after the conclusion of closing arguments, the jury requested demonstrative exhibits relating to the discipline of Johnson and the other officers about whom Chief Dotson was questioned. The trial court did not send the exhibits to the jury, noting that the IA administrative memos had not been admitted into evidence. Approximately two hours later, the jury requested a copy of Chief Dotson's testimony relating to the discipline of other officers, which the trial court also did not provide.

The jury returned verdicts in favor of all Respondents on all counts. Johnson now appeals.

### Points on Appeal

In Point One, Johnson alleges the trial court abused its discretion in overruling Johnson's objection to Respondents' closing argument that Johnson's race, disability, or complaints of discrimination had to be the sole, but-for reason for his termination. In Point Two, Johnson challenges the directed verdict granted in favor of Lt. Col. O'Toole because sufficient evidence supported the submission of a claim of race discrimination against Lt. Col. O'Toole. In Point Three, Johnson argues the trial court abused its discretion in excluding comparator evidence concerning white police officers. Finally, in Point Four, Johnson alleges error in the trial court's

7

refusal to submit the issue of punitive damages to the jury because Johnson presented substantial evidence of Respondents' reckless disregard for his rights.

Discussion

## I.     Point One—Closing Argument and the Causation Standard

Johnson's first point on appeal focuses on Respondents' characterization of the causation standard during closing argument as a "but-for standard" as opposed to the "contributing-factor standard." Our courts recognize the substantial difference between these two standards. Under the but-for standard, a plaintiff must show that an adverse employment action would not have occurred **but for** the consideration of an illegal factor such as race. Thomas v. McKeever's Enters., Inc., 388 S.W.3d 206, 216 (Mo. App. W.D. 2012) (internal citations omitted). Conversely, under the less onerous contributing-factor standard, a plaintiff need only show that an illegal factor such as race was a consideration in a defendant's decision. Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 94 (Mo. banc 2010) (providing that the consideration of factors such as race is equally "reprehensible" even where an employer has other reasons for its decision).

"We review the trial court's ruling in closing argument for an abuse of discretion." Nelson v. Waxman, 9 S.W.3d 601, 606 (Mo. banc 2000) (internal citation omitted); see also Travelers Commercial Cas. Co. v. Vac-It-All Servs., Inc., 451 S.W.3d 301, 311 (Mo. App. E.D. 2014) (internal citation omitted). "Misstatements of law are impermissible during closing argument and a trial court **has the duty, not discretion**, to restrain and purge such arguments." Fahy v. Dresser Indus., Inc., 740 S.W.2d 635, 641 (Mo. banc 1987) (internal citation omitted) (emphasis added); see also Estate of Overbey by Overbey v. Franklin, 558 S.W.3d 564, 573 n.10 (Mo. App. W.D. 2018) (internal citations omitted). However, even when a trial court errs, there is no abuse of discretion absent a showing of prejudice—specifically, a showing that the error

8

had a decisive effect on the jury's determination.  Peterson v. Progressive Contractors, Inc., 399 S.W.3d 850, 857 (Mo. App. W.D. 2013) (internal citation omitted).

Furthermore, "as a general principle, even if counsel misstates the law in closing argument, as long as the trial court properly instructs the jury, we will rarely find reversible error."  Minze v. Mo. Dep't of Pub. Safety, 541 S.W.3d 575, 583 (Mo. App. W.D. 2017) (internal citation omitted).  The underpinning for this principle is the jury's duty "to follow the trial court's instructions, and [the court's presumption] that [the jury] will even to the extent that doing so might require the jury to ignore specific argument of counsel in conflict."  Id. (internal quotation omitted).

With regard to Point One, Section 213.010(5)[2] of the MHRA defines discrimination as "any unfair treatment based on race . . . as it relates to employment [or] disability[.]"  See also Bram v. AT&T Mobility Servs., LLC, 564 S.W.3d 787, 796 (Mo. App. W.D. 2018).  Section 213.010(7) defines employer as "the state, or any political or civil subdivision thereof . . . and any person directly acting in the interest of an employer[.]"  This definition considers individuals who directly oversee or are actively involved in the discriminatory conduct as employers.  Davis v. Walgreen Co., 581 S.W.3d 619, 631 (Mo. App. W.D. 2019).  Section 213.055.1(1)(a) provides that it is an unlawful employment practice "[t]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or disability[.]"  See also Bram, 564 S.W.3d at 796.

---

[2] All Section references are to RSMo (2016), unless otherwise indicated.  Case law interpreting the Sections at issue in this case has since been expressly abrogated by statute.  Section 213.101 (Cum. Supp. 2018).  The statutory amendments include changing the causation standard from the contributing-factor standard to the more burdensome motivating-factor standard.  Bram v. AT&T Mobility Servs., LLC, 564 S.W.3d 787, 794–95 (Mo. App. W.D. 2018) (internal citations omitted).  However, these changes are not retroactive and therefore do not apply to the present case.  Id. at 794–96.

Under the governing version of the MHRA, an employer commits an unlawful employment practice if the employee's protected status is a contributing factor in taking an adverse employment action against the employee. Bram, 564 S.W.3d at 794–95 (internal citations omitted); Fleshner, 304 S.W.3d at 94. "A contributing factor is a factor that contributed a share in anything or has a part in producing the effect." Bram, 564 S.W.3d at 796 (internal quotation omitted). "[I]nstructions to the jury that they must find the defendant's conduct to be 'the sole cause,' or 'the dominant cause,' or 'the proximate cause' of the injury are rightly condemned as misleading error." Thomas, 388 S.W.3d at 216 (alteration in original) (internal quotation omitted).

Respondents' closing argument informing the jury that "in order to find a verdict for [Johnson], you have to believe that race . . . [o]r disability . . . [o]r retaliation was *the reason* for the decision," was clearly a misstatement of law. Respondents incorrectly explained a but-for standard of causation to the jury rather than the correct contributing-factor standard. See Bram, 564 S.W.3d at 794–95; Thomas, 388 S.W.3d at 216. As a result, the trial court committed clear error when it failed to sustain Johnson's objection to the misstatement of law. See Nelson, 9 S.W.3d at 606 (internal citation omitted); Fahy, 740 S.W.2d at 641 (internal citation omitted). At the time of trial, the law on the contributing factor causation standard point had been subject to extensive appellate review. The requirements of the standard were clear. The trial court's failure to sustain Johnson's objection is inexcusable and could be viewed as an endorsement of the Respondents' characterization. Importantly, the trial court had the duty to correct the misstatement of law made by Respondents, not Johnson. See Fahy, 740 S.W.2d at 641 (internal citation omitted). While we are troubled by the trial court's obvious error, we are not persuaded

10

that Johnson has made the requisite showing of prejudice to warrant reversal.  See Peterson, 399 S.W.3d at 857 (internal citation omitted).

In support of his claim of prejudice, Johnson proffers Halford v. Yandell, 558 S.W.2d 400, 412 (Mo. App. Springfield 1977), for the proposition that "[i]f the trial court overrules the objection" to a misstatement of law, then, "reversible error is almost inevitable."  Yet Halford simultaneously recognized that "[m]anifestly no rule can fit all such incidents[.]"  Id. Additionally, Halford did not address the general presumption *that the jury will follow the trial court's instructions, preventing any prejudice, even where counsel has made an argument contrary to the instructions.*  Minze, 541 S.W.3d at 583 (internal citation omitted).

The record shows that the trial court properly instructed the jury on the contributing-factor standard and that the jury instructions accurately stated the law governing the case. Therefore, we begin our analysis with the presumption that the jury followed these instructions and applied the contributing-factor standard when determining Respondents' liability on Johnson's claims.  See id.  Additional facts found in the record support applying the presumption in this case.  First, while it is true that Respondents misstated the law during closing argument and that the trial court failed to correct that misstatement, the record also shows that Respondents at other times correctly stated the law with regard to the standard of causation and repeatedly cautioned the jury to follow the verdict directors.  Second, when overruling Johnson's objection to Respondents' closing argument, the trial court expressly informed Johnson that he would "have an opportunity to respond."  The trial court did not express an opinion that Johnson's objection was incorrect.  Neither did the trial court remain silent on the issue.  Third, Johnson rebutted the Respondents' closing argument and correctly characterized the causation standard without objection.  Johnson had the final word on the issue of causation, and his word mirrored

11

the instructions given to the jury. Finally, the record suggests that while the jury made multiple inquiries of the trial court during their deliberations, no inquiry related to the standard of causation or any conflict between Respondents' closing argument and the written jury instructions. This fact strongly suggests the jury had no confusion as to the appropriate standard to apply.

Notwithstanding the trial court's obvious error, Johnson has failed to rebut the presumption that the jury followed the trial court's instructions. See id. Accordingly, Johnson has not demonstrated the prejudice necessary for reversal. See Peterson, 399 S.W.3d at 857 (internal citation omitted). Point One is denied.

## II.    Point Two—Directed Verdict in Favor of Lt. Col. O'Toole

In his second point on appeal, Johnson contends that the trial court erred in granting a directed verdict in favor of Lt. Col. O'Toole on Johnson's claim of race discrimination.

When reviewing a court's grant of a directed verdict we apply essentially the same standard as we do in determining whether a plaintiff has made a submissible case. Ellison v. Fry, 437 S.W.3d 762, 768 (Mo. banc 2014) (internal citation omitted). "Whether the plaintiff made a submissible case is a question of law that this Court reviews de novo." Id. (internal citation omitted). "A case may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence." Id. (internal citation omitted). Accordingly, we should affirm a trial court's grant of a directed verdict if at least one element of the plaintiff's case was not supported by the evidence. See id. (internal citations omitted). Additionally, we will affirm if it is clear that the directed verdict did not prejudice the plaintiff. See id. at 775 (affirming the directed verdict on the merits but noting that even if the directed verdict had been improper there was no prejudice meriting reversal); Gibbs v. Blockbuster, Inc., 318 S.W.3d 157,

12

177–78 (Mo. App. E.D. 2010) (finding the directed verdict was improperly granted but reversing only after separately finding it could not conclude that the plaintiff was not prejudiced).

Johnson's claim of discrimination encompasses three elements: (1) that Johnson suffered an adverse employment action; (2) that Johnson's race was a contributing factor; and (3) that Johnson was damaged as a result. See Bram, 564 S.W.3d at 796 (internal citations omitted); McGhee v. Schreiber Foods, Inc., 502 S.W.3d 658, 672 (Mo. App. W.D. 2016) (internal citation omitted).

Johnson argues that he presented evidence specific and unique to Lt. Col. O'Toole that would have allowed the jury to find against Lt. Col. O'Toole on Johnson's claim of race discrimination even though the jury found in favor of each of the other Respondents on that claim. Namely, Johnson emphasizes the alleged conversation between Lt. Madison and Lt. Col. O'Toole and Lt. Col. O'Toole's statement that police "owned the night" during the Jason Stockley protests. Johnson contends that the trial court's decision to grant a directed verdict only to Lt. Col. O'Toole is incomprehensible in light of this evidence specific to him.

Johnson's confusion is understandable, as the trial court did not explain its reason for granting a directed verdict for Lt. Col. O'Toole but denying the request for a directed verdict for the other Respondents. Despite the trial court's failure to explain its ruling, its reasoning is clearly discerned from the record. When requesting a directed verdict in favor of Lt. Col. O'Toole, Respondents argued that merely affixing a signature to a recommendation of discipline in his role as Inspector of Police did not constitute an adverse employment action. The record showed that Lt. Col. O'Toole did not work in IA and did not participate in the IA investigation of Johnson. Lt. Col. O'Toole affixed his signature to the recommendation made by the Bureau Commander for IA. While the trial court did not grant the directed verdict when initially

13

requested by Respondents, the trial court specifically queried Johnson how Lt. Col. O'Toole's signature met the requirements of engaging in adverse employment action. Additionally, in the jury instructions concerning Lt. Gardner and Chief Dotson, the trial court identified Lt. Gardner's recommendation of termination and Chief Dotson's termination of Johnson as the relevant adverse employment actions. From this context, we conclude that the trial court's reasoning for directing the verdict in favor of Lt. Col. O'Toole was the fact that Lt. Col. O'Toole merely signed off on Lt. Gardner's recommendation of termination and did not initiate any recommendation of termination as did Lt. Gardner. In the trial court's view, Lt. Col. O'Toole's limited role in the process of terminating Johnson did not constitute an adverse employment action.

Whether the trial court erred in concluding that Lt. Col. O'Toole's signature did not amount to an adverse employment action against Johnson is inconsequential to our analysis as we find this case to be the rare situation where Johnson clearly suffered no prejudice from the trial court's ruling. See Ellison, 437 S.W.3d at 775; Gibbs, 318 S.W.3d at 177–78.

We assume for the sake of argument that Lt. Col. O'Toole's decision to sign off on Lt. Gardner's recommendation that Johnson be terminated was an adverse employment action. We further assume that the jury would have found that Johnson's race was a contributing factor in Lt. Col. O'Toole's decision to do so, thereby satisfying the first two elements of Johnson's discrimination claim. See Bram, 564 S.W.3d at 796; McGhee, 502 S.W.3d at 672. But fatal to Johnson's point on appeal is the fact that the jury necessarily found that race was not a contributing factor in Johnson's termination when the jury returned verdicts in favor of both the City and Lt. Gardner on Johnson's claims. Notwithstanding the possibility that the jury could have found that race was a contributing factor in Lt. Col. O'Toole's conduct, the jury necessarily

14

also would have determined that Lt. Col. O'Toole's conduct was immaterial to Johnson's termination. Accordingly, Lt. Col. O'Toole's act in affixing his signature to Lt. Gardner's recommendation did not cause damage to Johnson. Failing to find evidence to support the third element of Johnson's claim against Lt. Col. O'Toole, the jury would have found Lt. Col. O'Toole not liable on Johnson's claim. See Bram, 564 S.W.3d at 796; McGhee, 502 S.W.3d at 672. Because the jury would have found Lt. Col. O'Toole not liable, Johnson was plainly not prejudiced. See Ellison, 437 S.W.3d at 775; Gibbs, 318 S.W.3d at 177–78.

Critically, the common concerns in our approach to reviewing issues concerning directed verdicts and judgments notwithstanding the verdict are our deference to the jury as the proper trier of fact and a corresponding admonition that courts not supplant juries in that role. See, e.g., Payne v. Fiesta Corp., 543 S.W.3d 109, 126 (Mo. App. E.D. 2018) (citing Ellison, 437 S.W.3d at 768) (providing we will only reverse a denial of a directed verdict or judgment as a matter of law if the plaintiff did not make a submissible case or the defense established an affirmative defense as a matter of law); Delacroix v. Doncasters, Inc., 407 S.W.3d 13, 39 (Mo. App. E.D. 2013) (en banc) (internal citation omitted) (noting a presumption in favor of reversing judgments notwithstanding the verdict); Li Lin v. Ellis, 594 S.W.3d 238, 241 (Mo. banc 2020) (per curiam) (internal citation omitted) (providing that upon review of a denial of a judgment notwithstanding the verdict we review the evidence in the light most favorable to the jury's verdict).

Even if we were to hold that the trial court had erred in granting the directed verdict, and thereby deprived the jury of a chance to make a formal finding as to Lt. Col. O'Toole's liability, we are persuaded that a lack of prejudice precludes reversal. In fact, for the reasons discussed above, a reversal of the trial court's grant of a directed verdict would have the potential of

15

undermining the formal findings that the jury did reach—namely, that Johnson's race was not a contributing factor in his termination from the SLMPD.

The verdicts rendered by the jury as to the City and Lt. Gardner persuade us that the jury similarly would have rendered a verdict in favor of Lt. Col. O'Toole had they been given the opportunity. Because Johnson clearly was not prejudiced by the entry of the directed verdict in favor of Lt. Col. O'Toole, we deny Point Two. See Ellison, 437 S.W.3d at 775; Gibbs, 318 S.W.3d at 177–78.

## III. Point Three—Exclusion of IA Administrative Memos as Comparator Evidence

In his third point on appeal, Johnson alleges the trial court abused its discretion in excluding the IA administrative memos relating to the discipline of other officers that constituted comparator evidence. Comparator evidence showing that similarly-situated employees were treated disparately can support a claim of race discrimination. McGhee, 502 S.W.3d at 667 (internal citations omitted). Johnson argues that the IA administrative memos showed that white police officers who were charged with one or both of conduct unbecoming of an officer or false reporting received lesser punishment than Johnson, and therefore the evidence was admissible as comparator evidence.

We review a trial court's evidentiary ruling for abuse of discretion. Moore v. Ford Motor Co., 332 S.W.3d 749, 756 (Mo. banc 2011) (internal citation omitted). "A trial court abuses its discretion when it makes a ruling that is 'clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.'" Teasdale & Assocs. v. Richmond Heights Church of God in Christ, 373 S.W.3d 17, 21 (Mo. App. E.D. 2012) (quoting State v. Kemp, 212 S.W.3d 135, 145 (Mo. banc 2007)). Even if the trial court's given reason for an evidentiary ruling is incorrect, we will affirm so long as the ruling could have been properly reached on any ground. See Moore, 332 S.W.3d at 766 (internal citation omitted).

16

Here, the trial court excluded the documentary comparator evidence on hearsay grounds. Without reaching whether that ruling was correct on the given hearsay grounds, we find that the evidence was properly excluded as being not legally relevant. See id.

"As with other forms of evidence, circumstantial evidence of employment discrimination must be both logically and legally relevant to be admissible." Cox v. Kansas City Chiefs Football Club, Inc., 473 S.W.3d 107, 116 (Mo. banc 2015) (internal citation omitted). Logically relevant evidence "tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or . . . tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." Id. (internal quotation omitted). Comparator evidence is logically relevant so long as the plaintiff and the individuals they are being compared to are not so different that comparisons are "effectively useless." Id. at 123 n.14 (internal citations omitted). Accordingly, while there were differences in rank, allegations, and charges brought between Johnson and some of the comparators, these differences were not so large as to render comparisons "effectively useless" and we find the documentary comparator evidence was logically relevant. See id.

Evidence is legally relevant if its probative value is not substantially outweighed by other costs, such as whether the evidence is unnecessarily cumulative or is unfairly prejudicial. Shallow v. Follwell, 554 S.W.3d 878, 883 (Mo. banc 2018) (internal citation omitted). "Evidence is said to be cumulative when it relates to a matter so fully and properly proved by other testimony as to take it out of the area of serious dispute." Id. (internal quotation omitted). Evidence that is different in character is not cumulative. Smith v. Kansas City S. Ry. Co., 87 S.W.3d 266, 279 (Mo. App. W.D. 2002).

17

Here, Johnson was allowed to question Chief Dotson at trial about the comparator evidence at great length. Indeed, the trial court expressly informed Johnson that he could ask Chief Dotson "anything about anything" within the IA administrative memos. Notably, Johnson's point on appeal does not allege that there was any evidence contained in the IA administrative memos that he could not have introduced via testimony. Additionally, Johnson argued to the trial court that it was not the truthfulness of the factual contents of the IA administrative memos that mattered but rather how Chief Dotson relied on the contents. We are persuaded that the IA administrative memos merely repeated facts that Johnson was allowed to establish through live testimony, facts that Johnson admits were not relevant for their truthfulness. The contents of the memos simply were not in serious dispute, and therefore the evidence could be properly excluded as cumulative. See Shallow, 554 S.W.3d at 883 (internal citation omitted).

Johnson nevertheless argues that the evidence he sought to introduce was not cumulative because the IA administrative memos were different in character from Chief Dotson's testimony. See Smith, 87 S.W.3d at 279. Johnson relies on the facts of Smith, citing that the testimony of one witness in that case was found to be different in character from the testimony of another witness, in part because one witness was the plaintiff's co-worker and the other was the plaintiff's supervisor. See id. Johnson's reliance on Smith is misguided because Johnson did not seek to introduce testimony of two separate witnesses. Nor did Johnson seek to present evidence from two separate sources of evidence. The only issue before the trial court was whether the contents of the IA administrative memos would be introduced by introducing the physical memos into evidence or by introducing the substance of the memos through Chief Dotson's testimony. We further note that in Smith, the testimony of the two witnesses was found to be

18

different in character in part because there was ***contradictory testimony*** about the facts at issue. Id. Therefore, that testimony was plainly not cumulative as it concerned matters still in "serious dispute." See Shallow, 554 S.W.3d at 883 (internal citation omitted). The record here, however, supports a finding that the written IA administrative memos included evidence that was not only cumulative, but also ***identical*** to what Johnson either introduced at trial or could have introduced through Chief Dotson's testimony.

The contents of the IA administrative memos were cumulative of Chief Dotson's testimony and therefore legally irrelevant. See Shallow, 554 S.W.3d at 883 (internal citation omitted). Accordingly, the trial court did not abuse its discretion. See Moore, 332 S.W.3d at 756, 766 (internal citation omitted). Point Three is denied.

## IV. Point Four

In his fourth point on appeal, Johnson contends that the trial court erred in not submitting to the jury the issue of punitive damages. However, Johnson has conceded that this issue is moot if we deny his other points on appeal, which we have done. Point Four is denied.

### Conclusion

The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, Judge

Philip M. Hess, P.J., concurs.
Lisa P. Page, J., concurs.