

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| PERRY ALLEN, | ) | |
| | ) | |
| Appellant, | ) | WD87287 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | |
| MISSOURI HIGHWAYS AND | ) | March 4, 2025 |
| TRANSPORTATION COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable J. Dale Youngs, Judge**

**Before Division Two: Janet Sutton, Presiding Judge,**
**Alok Ahuja, Judge, and Mark D. Pfeiffer, Judge**

Perry Allen (Allen) appeals from the Jackson County Circuit Court's (trial court) entry of

summary judgment for the Missouri Highways and Transportation Commission (the

Commission). Allen raises six points on appeal. In points one through four, Allen argues that the

trial court erred in granting summary judgment on his discrimination and retaliation claims

because it relied only on Allen's admission that C.R., who authored the termination letter, did not

personally discriminate against Allen, but he claims this was error because C.R. was not the sole

decision maker. In his fifth point on appeal, Allen argues the trial court erred in granting

summary judgment on his hostile work environment claim because the Commission did not

establish a right to judgment as a matter of law by only relying on the lack of severe or pervasive

harassment and Allen's admission that C.R. did not personally discriminate against him.  Last, Allen argues the trial court erred in granting summary judgment on the Commission's affirmative defense of failure to exhaust administrative remedies because there was sufficient evidence to support the continuing violation theory.  Finding no error, we affirm.

## Factual and Procedural Background[1]

Allen is a white male over the age of forty.  In February 1991, Allen began working for the Missouri Department of Transportation (MoDOT)[2] as a construction inspector in the Kansas City district in Lee's Summit, Missouri.

On March 15, 2015, M.V., the Director of MoDOT's audits and investigations division, interviewed Allen as part of an investigation into another employee's alleged misconduct.  Allen alleged that M.V.'s conduct during the interview was discriminatory and created a hostile work environment for him.  Allen did not recall M.V. saying anything derogatory about Allen's sex, race, or age during the interview.  Allen never filed an internal complaint of discrimination, retaliation, or hostile work environment regarding M.V.'s conduct during the interview.  M.V. did not interview Allen again and, after the March 2015 interview, Allen and M.V. only interacted three or four times before his termination.  M.V.'s office was in MoDOT's central office in Jefferson City, Missouri.

---

[1] "When reviewing the entry of summary judgment, we view the record in the light most favorable to the party against whom the judgment was entered and accord the non-movant all reasonable inferences from the record." *Show-Me Inst. v. Off. of Admin.*, 645 S.W.3d 602, 604 n.2 (Mo. App. W.D. 2022) (citing *Green v. Fotoohighiam*, 606 S.W.3d 113, 116 (Mo. banc 2020)).  Additionally, we only review the uncontroverted material facts established in accordance with the Rule 74.04(c) procedure. *Id.*  This factual background provides the uncontroverted facts based on the summary judgment pleadings.

[2] Although MoDOT was Allen's employer, the Commission, which superintends MoDOT, is the proper party under section 226.100.  All statutory references are to the Revised Statutes of Missouri (2016) as currently updated.

D.H. was the human resources manager for the Kansas City district from 2013 through January 2022.[3] In December 2016, Allen attempted to get in touch with D.H. about a situation involving two other employees. Allen did not report the incident to MoDOT's human resources division in the central office or to MoDOT's audits and investigations division. In the nine years that Allen and D.H. worked together at MoDOT, they only had three or four negative interactions.

Allen was promoted to assistant district engineer in MoDOT's Kansas City district in 2018.

On August 8, 2019, Allen was placed on disciplinary probation, which he does not believe was retaliatory or discriminatory based on sex, race, or age.

In March 2020, Allen and D.H. met in D.H.'s office to discuss an employee matter. D.H. "shouted over" Allen during a phone conversation. After the meeting, D.H. went to Allen's office and told Allen that he had embarrassed her in front of central office human resources staff. According to Allen, D.H. was extremely irate, agitated, yelled at Allen for about five minutes, paced back-and-forth, made hand gestures, and slapped the back of Allen's chair. D.H. told Allen that "[he] wouldn't be questioning any of this if [D.H.] wasn't black or female." Allen did not directly report the incident to MoDOT's central office human resources division or MoDOT's audits and investigations division. A few days later, Allen reported the incident to D.S., the district engineer for the Kansas City district and Allen's supervisor.

In Fall 2020, M.V. asked Allen to schedule a meeting with one of his subordinates so that M.V. could obtain the subordinate's cellphone.

---

[3] The parties refer to the Kansas City district as the local human resources office.

In September 2021, Allen emailed C.R. describing the March 2020 incident with D.H. in Allen's office. C.R. forwarded Allen's email to M.V. and S.M., the human resources director at the time. According to Allen, D.H.'s yelling and aggressiveness made Allen feel "beat down" and he stopped bringing ideas or challenging D.H. because he feared D.H.'s reaction. Allen also claimed he felt discouraged, demeaned, and pushed aside from D.H.'s yelling and the 2019 discipline.

Allen was terminated on October 27, 2021. At that time, C.R. was the district engineer for MoDOT's Kansas City district who terminated Allen and authored the termination letter. As the district engineer, C.R. was the only individual with authority to terminate employees in MoDOT's Kansas City district. According to C.R., he made the decision to terminate Allen on October 27, 2021. C.R. stated he made the decision to terminate Allen after M.V. informed him audits and investigations discovered Allen sent inappropriate text messages on his work-issued cellphone. D.H was not involved in the decision to terminate Allen, and C.R. did not consult with M.V. regarding the decision to terminate Allen. Allen does not allege that C.R. discriminated or retaliated against him in C.R.'s personal capacity.

On December 30, 2021, Allen filed a charge of discrimination with the Missouri Commission on Human Rights (MCHR) alleging discrimination based on race, sex, and age, hostile work environment, and retaliation. Allen subsequently filed a petition for damages in the Circuit Court of Jackson County, Missouri, in November 2022 with the same claims.

The Commission filed a motion for summary judgment and statement of uncontroverted material facts, arguing that Allen failed to make a *prima facie* case for discrimination because Allen admitted his termination—the only adverse employment action—was not motivated by his race, age, or sex. Additionally, the Commission argued Allen's admission that C.R. did not

discriminate against him was fatal to his retaliation claim because C.R. was the sole decision maker for the termination decision. The Commission further argued that Allen's hostile work environment claim failed because he could not establish that he was subjected to unwelcome harassment and that his employment was affected by the harassment when Allen admitted C.R.'s decision to terminate him was not discriminatory or retaliatory in nature.

Allen filed suggestions in opposition with a statement of uncontroverted material facts and responses to the Commission's statement of uncontroverted facts. Allen stated the sole basis for the summary judgment motion on the discrimination claims was Allen's testimony that he did not believe C.R. personally discriminated against him, but Allen pointed out there was no individual claim against C.R. Instead, Allen argued, the Commission as an entity discriminated against Allen regardless of who signed the termination letter. Allen also argued the Commission was not entitled to summary judgment on his retaliation claim because C.R. consulted with D.H. and M.V., who both acted with a discriminatory or retaliatory motive. Last, Allen argued the Commission was not entitled to summary judgment on the hostile work environment claim because Allen's termination was sufficient to establish a hostile work environment.

The Commission filed a response to Allen's statement of uncontroverted material facts and a reply memorandum in support of its motion for summary judgment.

The trial court granted the Commission's motion for summary judgment, concluding that Allen "failed to meet his burden to show a genuine issue as to the material facts that would support his claims for discrimination, hostile work environment, and retaliation under the [Missouri Human Rights Act (MHRA)]."

Allen timely appeals. Additional facts relevant to the disposition of the appeal are included below as we discuss Allen's six points on appeal.

5

**Standard of Review**

"We review the grant of summary judgment *de novo*." *Show-Me Inst. v. Off. of Admin.*, 645 S.W.3d 602, 607 (Mo. App. W.D. 2022). Rule 74.04 provides the mandatory procedure for summary judgment practice in Missouri. *Cox v. Callaway Cnty. Sherriff's Dept.*, 663 S.W.3d 842, 848 (Mo. App. W.D. 2023).[4] Summary judgment shall be entered when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6); *Green v. Fotoohighiam*, 606 S.W.3d 113, 115 (Mo. banc 2020). Defending parties are entitled to summary judgment if they demonstrate:

> (1) facts negating any one of the claimant's elements necessary for judgment; (2) that the claimant, after an adequate period of discovery, has not been able to—and will not be able to—produce evidence sufficient to allow the trier of fact to find the existence of one of the claimant's elements; or (3) facts necessary to support [their] properly pleaded affirmative defense.

*Cox*, 663 S.W.3d at 847 (citations omitted).

Because we review the grant of summary judgment *de novo*, we use the same procedure as the trial court to determine whether a party is entitled to summary judgment. *Id.* at 849; *see* Rule 74.04(c).

**Legal Analysis**

***Points One through Three***

In Allen's first three points on appeal, he argues that the trial court erred in granting summary judgment on his age, race, and sex discrimination claims because the Commission based its summary judgment motion only on Allen's admission that C.R. did not personally discriminate against him. Allen argues there is evidence that C.R. was not the sole decision maker and, thus, the Commission was not entitled to summary judgment.

---

[4] Rule references are to the Missouri Supreme Court Rules (2024).

To establish an age or race discrimination claim under the MHRA, Allen must show "(1) that he suffered an adverse employment action; (2) that his [age or race] was the motivating factor; and (3) that he suffered damage as a result."[5] *Eivins v. Mo. Dep't of Corr.,* 636 S.W.3d 155, 166 (Mo. App. W.D. 2021); *Clark v. AT&T Mobility Servs., LLC*, 623 S.W.3d 197, 206 (Mo. App. W.D. 2021). For a sex discrimination claim in the workplace, Allen must prove that "(1) [he] was a member of a protected class; (2) [he] was qualified to perform the job; (3) [he] suffered an adverse employment action; and (4) [he] was treated differently from other similarly situated employees of the opposite sex." *Lampley v. Mo. Comm'n on Hum. Rts.*, 570 S.W.3d 16, 24 (Mo. banc 2019).

It is uncontroverted that Allen is only alleging discriminatory conduct by M.V. and D.H., and not by C.R. in his personal capacity. It is also uncontroverted that C.R. penned Allen's termination letter, which stated: "[t]his letter serves as confirmation of my decision to release you from employment effective October 27, 2021." To support his assertion that C.R. potentially was not the sole decision maker, Allen cites to MoDOT's personnel policy requiring that supervisors provide termination letters and "[c]onsult with a Central Office HR representative . . . regarding the content of [the termination] letter before it is signed and issued." The policy further requires supervisors to "consult[] with the local human resources (HR) office for a consistency review/recommendation prior to administering any discipline greater than a verbal warning." Additionally, Allen cites MoDOT's position statement to the MCHR, stating "[C.R.], Kansas City District Engineer, in consultation with Central Office Human Resources, terminated the employment of [Allen]." Allen argues M.V. was also involved in the termination decision

---

[5] Section 213.010(1) defines "age" under the MHRA as forty or more years but less than seventy.

7

because C.R. wrote the termination letter after M.V. informed him about the audits and investigations discovery.

First, we note that D.H. managed the local HR department—not the central HR department. Therefore, the only evidence that is seemingly relevant to Allen's argument is the HR policy requiring supervisors, like C.R., to consult with local HR before administering any discipline greater than a verbal warning and not the HR policy specifically pertaining to the content of a termination letter and MoDOT's position statement because both of these only refer to central HR. However, C.R. stated in his affidavit that D.H. did not participate in the decision to terminate Allen's employment. In regard to M.V., C.R.'s affidavit states he had the sole authority to terminate Allen, he made the decision to terminate Allen after M.V. provided him with information, yet he did not consult with M.V. when determining Allen's level of discipline. In short, the evidence in the summary judgment record establishes that C.R. was the sole decision maker in Allen's termination. And although Allen attempts to make several arguments to demonstrate his admission did not warrant summary judgment, we disagree for the reasons discussed *infra*.

Allen argues that his admission, at best, establishes that C.R. did not personally discriminate against him, but that does not entitle the Commission to summary judgment because Allen does not have an individual discrimination claim against C.R. As the Commission notes, there is no evidence indicating that C.R. did not act in his professional capacity as an agent of his employer, MoDOT. *See Coyne v. Edwards*, 395 S.W.3d 509, 515 (Mo. banc 2013) ("A governmental entity . . . can act only through its officers and employees."). In Allen's termination letter on MoDOT letterhead signed by C.R., C.R. states: "[t]his letter serves as confirmation of my decision to release you from employment[.]" Again, C.R. was the sole

8

individual with the authority to terminate Allen's employment with MoDOT. Despite agreeing that he could not have had an individual claim against C.R., Allen uses this proposition to instead argue that D.H. and M.V.'s alleged discrimination should be imputed to C.R. due to their purported consultations. We disagree.

Allen analogizes to *McGhee v. Schreiber Foods, Inc.*, 502 S.W.3d 658, 669 (Mo. App. W.D. 2016), to support his proposition that C.R. was not the sole decision maker because he consulted with the human resources office, including the local office managed by D.H. In *McGhee*, this Court evaluated whether several disciplined employees were considered similarly situated for purposes of finding discriminatory intent or motive. *Id.* at 665. The employees' discipline was decided by different decision makers or they were subjected to different policies. *Id.* The disciplinary process involved a leadership team composed of a plant manager, HR manager, other salaried leaders, and people at the employer's home office whom all other individuals reported to. *Id.* at 668. Once the employer was notified of a potential violation, the leadership team gathered information to determine the seriousness of the violation and corresponding punishment. *Id.* After the leadership team recommended a disciplinary action, an employee could seek review by the plant manager or a peer review panel, both of which could only affirm or reduce the punishment. *Id.* Additionally, the policy required the "Plant Manager [to] review[] all documentation to [e]nsure completeness, consistency[,] and fairness for those peer reviews conducted by the panel process," giving the plant manager final authority over all appealed terminations. *Id.* at 669. The plant manager at the time testified that he would discuss any questions with the leadership team, the HR manager, and employees in the home office. *Id.* at 663, 669. The plant manager also "answered directly to [employer's] corporate office and ran alleged conduct violations and their punishments by the corporate office." *Id.* at 669. Based on

9

this, we concluded that the evidence supported a finding that there was a common decision maker because the jury could find that the senior management and home office "continued to exercise final decision-making authority over all employment determinations." *Id.* at 667-69.

Unlike *McGhee* where the plant manager's testimony established that he consulted with the leadership team, HR manager, home office employees, and corporate office, Allen has not presented any testimony or evidence indicating that C.R. consulted with M.V. or D.H. in making the disciplinary decision. Instead, C.R.'s affidavit specifically states that he did not consult with M.V. to determine Allen's discipline and that D.H. did not participate in the decision to terminate Allen. Also, unlike in *McGhee* where the plant manager ran proposed punishments by the corporate office because he directly reported to them, there is no evidence that C.R. answered directly to M.V. or D.H. Here, the evidence shows that C.R., as the district engineer, was the sole individual with the authority to terminate employees working in MoDOT's Kansas City district. Allen only provided the HR policy requiring C.R. to consult with local HR (managed by D.H.) "prior to administering any discipline greater than a verbal warning," and there is no evidence in the summary judgment record indicating any "consultation" regarding Allen's punishment actually occurred, local HR's role in determining punishment, nor is there evidence indicating that D.H., specifically, was even consulted.

Allen additionally relies on *Ferguson v. Curators of Lincoln University*, 498 S.W.3d 481, 490 (Mo. App. W.D. 2016), to argue that discrimination might be considered a "factor" in his termination because D.H. and M.V.'s discriminatory intent could have passed to C.R. In *Ferguson*, an employee appealed his termination to a review panel consisting of four individuals, claiming that he was terminated because of his age. *Id.* at 487. During the panel's hearing, one member stated he would choose to terminate a person who has earned their full retirement over a

10

young person who recently started the job and was raising a young family because the latter person would face "a lot of hardship" if terminated. *Id.* The panel provided a report and findings, recommended upholding the termination, and the university president relied on the panel's report and accepted the termination. *Id.* at 486, 488. The president testified that "if the panel had found differently, she may have changed her decision." *Id.* at 490. Based on the president's testimony and because she relied on the report, this Court concluded that the panel member was "in a position to influence [the university president,] the [ultimate] decisionmaker." *Id.*

Again, Allen's case is not analogous. The panel member in *Ferguson* made a discriminatory remark during a procedure where he was specifically tasked with reviewing the employee's termination and making a recommendation to the university president. In contrast, M.V. provided a memo to C.R. informing him that an investigation had revealed that Allen had sent inappropriate text messages on his work-issued cellphone. As the Commission notes, there is no evidence indicating that the memo made any recommendation on discipline. Importantly, in *Ferguson*, there was explicit evidence tying the discriminatory conduct to the non-discriminating decision maker: testimony from the decision maker herself that she might have changed her decision if the panel made a different recommendation. Here, no such evidence exists in the record and, instead, C.R.'s affidavit specifically states that he did not consult with M.V. to determine Allen's discipline and that D.H. did not participate in the decision to terminate Allen.

Allen also argues that he does not need to satisfy the requirements of the *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), burden-shifting framework. We disagree. Section 213.101(3) states: "If an employer in a case brought under this chapter files a motion

11

pursuant to [R]ule 74.04 of the Missouri rules of civil procedure, the court **shall** consider the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny to be highly persuasive . . . ." Section 213.101(3) (emphasis added). Under *McDonnell Douglas*, the plaintiff-employee must first establish a *prima facie* case of discrimination. *McDonnell*, 411 U.S. at 802. The burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the employer gives such a reason, the burden shifts back to the employee to produce evidence supporting an inference that the employer's rationale was mere pretext for the discrimination. *Id.* at 804; *Eivins*, 636 S.W.3d at 167 (citation omitted).

In its summary judgment motion, the Commission explicitly alleged, as an uncontroverted material fact, that C.R. had terminated Allen's employment for a legitimate nondiscriminatory reason—namely, "sen[ding] inappropriate text messages on his work-issued cell phone." To the extent Allen contended that this proffered justification was pretextual, he was required to come forward with summary judgment evidence to controvert that claim. Whether looking at Allen's establishment of a *prima facia* case or his burden to show the Commission's reason was pretextual, his evidence fails. To rebut the legitimate, nondiscriminatory reasons set forth by employer, Allen must point to "enough admissible evidence to raise genuine doubt as to the legitimacy of the [employer's] motive, even if that evidence [does] not directly contradict or disprove [the] [employer's] articulated reasons for its actions." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (citations and internal quotation omitted). The trial court clearly cited to this burden shifting analysis in its grant of summary judgment for Commission.

The Commission's summary judgment motion acknowledged that C.R. made the decision to terminate Allen based on information concerning improper cellphone usage which was provided by M.V. In his briefing, Allen contends that C.R.'s reliance on information supplied by M.V. triggers the following principle: "'When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, [the] discrimination might . . . be called a 'factor' . . . in the decision.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 418-419 (2011) (citation omitted; quoted with approval in *Ferguson*, 498 S.W.3d at 490). Despite his suggestion that the termination decision was tainted by M.V.'s involvement, however, Allen also argues that he "was not required to show that . . . M.V. . . . acted discriminatorily . . . ." We cannot agree. The Commission put forward evidence that Allen had been terminated by a decisionmaker lacking discriminatory animus, who made the decision to terminate Allen for a non-discriminatory reason. If Allen contended that summary judgment was nevertheless inappropriate because the termination decision was tainted by the involvement of an individual harboring a discriminatory motivation, he had to come forward with evidence creating a triable factual issue that the termination decision was improperly tainted; he could not simply rely on caselaw recognizing such a possibility.

Allen has failed to produce any record evidence in his response to the Commission's motion for summary judgment indicating that M.V. or D.H. had any influence on, or provided input to, C.R. regarding his decision to terminate Allen. On the contrary, C.R. stated he did not consult M.V. or D.H. when determining the level of discipline to issue Allen.

In sum, there is no evidence indicating any individuals, other than C.R., made the decision to terminate Allen. Without such evidence, the trial court did not err in granting

13

summary judgment on Allen's discrimination claims in light of Allen's admission that C.R. did not discriminate against him in his personal capacity.

Points one, two, and three are denied.

### *Point Four*

In his fourth point on appeal, Allen argues that the trial court erred in granting summary judgment on his retaliation claim because the Commission did not establish a right to judgment as a matter of law where it relied only on Allen's admission that C.R. did not personally discriminate against Allen, but this is insufficient because C.R. was not the sole decision maker in Allen's termination.

To establish a *prima facie* case of retaliation under the MHRA, Allen must prove that "(1) he complained of discrimination; (2) [his] employer took adverse action against [him]; and (3) a causal relationship existed between the complaint and the adverse action." *Minze v. Mo. Dep't. of Pub. Safety*, 437 S.W.3d 271, 275 (Mo. App. W.D. 2014) (citation omitted).

Allen notes that we only need to consider element three because summary judgment was based on Allen's admission that C.R. did not personally discriminate or retaliate against him and, the finding therefore, that no causal relationship between the complaint and the adverse action existed. However, Allen asserts that the Commission cannot escape liability even if C.R. did not have retaliatory motive because he consulted with D.H. and M.V., whom both allegedly acted with a retaliatory motive.

As we discussed *supra*, the summary judgment record does not establish that C.R. relied on any recommendation from M.V. when deciding to terminate Allen, nor does it establish that he decided to write the termination letter because he consulted with the local human resources

14

office, managed by D.H. Without any such evidence, Allen is unable to establish a causal relationship between his complaint and termination and, thus, summary judgment was proper.

Point four is denied.

### *Point Five*

In his fifth point on appeal, Allen argues that the trial court erred in granting summary judgment on Allen's hostile work environment claim because the Commission did not establish a right to judgment as a matter of law where it relied on the lack of severe or pervasive harassment, instead of Allen's termination, which is sufficient to support a hostile work environment claim. Additionally, Allen asserts the trial court erred because it relied only on Allen's claim that C.R. did not personally discriminate against him, but that this is insufficient because C.R. was not the sole decision maker.

A successful hostile work environment claim requires Allen to show that "(1) he is a member of a group protected under the MHRA; (2) he was subjected to unwelcome harassment; (3) [Allen's] membership in the protected group was a motivating factor in the harassment; and (4) a term, condition, or privilege of [Allen's] employment was affected by the harassment." *Eivins*, 636 S.W.3d at 179.

To satisfy the fourth element, Allen must show that the "harassment affected a term, condition, or privilege of employment by *either* causing a tangible employment action *or* an abusive working environment." *Shiffman v. Kansas City Royals Baseball Club, LLC*, 687 S.W.3d 443, 470 (Mo. App. W.D. 2024) (citations omitted). The standard to satisfy this element is demanding. *Young v. Mo. Dep't of Corr.*, 691 S.W.3d 815, 824 (Mo. App. W.D. 2024) (citation omitted). "The harassing conduct must be so intimidating, offensive, or hostile that it poisoned the work environment and that the workplace was permeated with discriminatory intimidation,

15

ridicule, and insult, both viewed subjectively by the plaintiff and viewed objectively by a reasonable person." *Id.* (citation and internal quotation omitted). We determine the hostility of the environment by examining the totality of the circumstances. *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 798 (Mo. App. W.D. 2018).

Allen claims that discriminatory conduct by M.V. and D.H. created a hostile work environment for him. However, he cannot establish that the alleged hostile work environment affected a term, condition, or privilege of his employment by causing a tangible employment action. *See Shiffman*, 687 S.W.3d at 471 (citation omitted) (explaining a tangible employment action is "a significant change in employment status" that may include termination). C.R. was the only individual with authority to terminate Allen, and he made the decision to terminate Allen without M.V. or D.H. Because Allen claimed that only M.V. and D.H. discriminated against him while admitting that C.R. did not, he is unable to establish the causal link between the alleged discrimination and the tangible employment action (i.e., his termination). *See id.*

Viewing the summary judgment record in the light most favorable to Allen, a fact-finder also could not reasonably find that M.V. and D.H.'s interactions with Allen were so severe or pervasive enough to cause an abusive working environment.[6] *See id.* at 471-72 (explaining one or two alleged derogatory comments about employee's religion did not constitute a work

---

[6] In Allen's reply brief, he argues the Commission changed its theory for summary judgment. We disagree. Allen states that the Commission's argument on appeal addresses the third element of a hostile work environment claim and was not the basis for its summary judgment motion, which addressed the second and fourth elements. However, the Commission's argument on appeal addresses the fourth element which can be satisfied by showing that the "harassment affected a term, condition, or privilege of employment by either causing a tangible employment action *or an abusive working environment*." *Shiffman v. Kansas City Royals Baseball Club, LLC*, 687 S.W.3d 443, 470 (Mo. App. W.D. 2024) (emphasis added) (citations omitted). On appeal, the Commission argues: "Even viewing the uncontroverted facts in the light most favorable to [Allen], the alleged instances of discrimination clearly fall short of being objectively so severe or pervasive as to create an abusive work environment."

environment "permeated with discriminatory abuse"). *But see McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 739, 749-50 (Mo. App. E.D. 2020) (finding hostility was severe and pervasive when employee presented evidence that discrimination interfered with job performance, testified to multiple instances of racial hostility, submitted evidence of a supervisor demeaning her in front of colleagues and fellow employee aggressively yelling at her in front of two other employees, and the fact that she was accused of having an intimate relationship with a White employee when she filed an HR complaint); *Bram*, 564 S.W.3d at 798 (finding the trial court erred in granting summary judgment on a hostile work environment claim when employee presented evidence that her supervisors made repeated derogatory comments about White people, that she was unfairly criticized, yelled at, denied sales and training, required to take on additional duties, treated differently than Black employees, and denied privileges Black employees received).

Allen argues M.V.'s discriminatory conduct created a hostile work environment, but there were only two interactions with M.V. upon which Allen bases this claim. First, the instance where M.V. interviewed Allen in March 2015 as part of an investigation into another employee's alleged misconduct. Allen does not recall M.V. saying anything derogatory about his sex, race, or age during the interview. Second, the Fall 2020 encounter when M.V. asked Allen to schedule a meeting with one of his subordinates so that M.V. could obtain the subordinate's cellphone. Overall, Allen admits he and M.V. only interacted three or four times between March 2015 and his termination in October 2021.

In regard to D.H.'s alleged discriminatory conduct, Allen and D.H. only had three or four negative interactions in the nine years they worked together at MoDOT. One instance was in December 2016 when D.H. told Allen he lacked the proper authority to advise two other

employees about a personnel matter. Then, in March 2020, D.H. "shouted over" Allen during a phone conversation before D.H. went to Allen's office and told him he embarrassed her. D.H. was apparently irate, yelled at Allen, slapped the back of his chair, and said "[he] wouldn't be questioning any of this if [D.H.] wasn't black or female."

The incidents that Allen points to are merely isolated incidents and a reasonable person could not conclude that his workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Young*, 691 S.W.3d at 824 (citation omitted). *See Shiffman*, 687 S.W.3d at 470 (citation omitted) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."); *Moore v. Sw. Bell Tel. Co.*, 684 S.W.3d 187, 208-09 (Mo. App. E.D. 2023). Beyond these several instances, the summary judgment record does not contain any other evidence indicating Allen endured day-to-day harassment. *See Shiffman*, 687 S.W.3d at 471. Therefore, the trial court did not err in granting summary judgment on Allen's hostile work environment claim.

Point five is denied.

## Point Six

In his sixth point on appeal, Allen argues that there was sufficient evidence to support the continuing violation theory and, therefore, the trial court erred in granting the Commission's motion for summary judgment on its affirmative defense of failure to exhaust administrative remedies, thus not considering the otherwise untimely actions of alleged discrimination or retaliation.

We first note that the trial court's judgment makes no mention of a finding regarding the continuing violation theory and whether Allen's alleged acts, which would otherwise be time-barred, could nonetheless be considered by the trial court under the continuing violation theory.

18

The trial court concluded in its judgment, "that plaintiff has failed to meet his burden to show a genuine issue as to the material facts that would support his claims for discrimination, hostile work environment, and retaliation under the MHRA." Out of an abundance of caution, we will address the argument Allen makes in his sixth point since the court also said ". . . and for the reasons set forth by [the Commission] in its briefing on the motion, . . . " as the Commission did argue in its briefing about the untimeliness of the acts on which Allen based his charge of discrimination.

"Under the continuing violation theory, a victim of discrimination may pursue a claim for an act occurring prior to the statutory period, if [he] can demonstrate the act is part of an ongoing *practice or pattern* of discrimination by [his] employer." *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 117 n.7 (Mo. banc 2015). Under the continuing violation theory, Allen must (1) "demonstrate that at least one act occurred within the [180-day] filing period" and (2) "show that the current claim of discrimination is part of a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination." *McKinney v. City of Kansas City*, 576 S.W.3d 194, 199 n.6 (Mo. App. W.D. 2019) (quoting *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 252 (Mo. App. W.D. 2012)). One example of a continuing violation is a hostile work environment claim because it involves repeated conduct over a period of time. *Williams v. City of Kansas City*, 641 S.W.3d 302, 329 n.9 (Mo. App. W.D. 2021) (citations omitted).

Allen fails to satisfy the second element of the continuing violation theory. Although Allen's termination occurred within the 180-day filing period required by section 213.075.1, Allen fails to demonstrate that his claim of alleged discrimination is part of a series of interrelated events. As the Commission points out, Allen is misplaced in his reliance on *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), to argue that his alleged

19

hostile work environment claim constitutes a continuous violation. Following *Morgan*, this Court stated that a continuous violation can be established if the "claim is based upon a series of closely-related, similar events that occurred within the same general time period and stemmed from the same source[.]" *Tisch*, 368 S.W.3d at 254-55 (citation omitted). Specifically, we "look for day-to-day discriminatory events that occur on a regular basis." *Id.* at 255 (citation and internal quotation omitted). *See Miller-Weaver v. Dieomatic Inc.*, 657 S.W.3d 245, 257 (Mo. App. W.D. 2022) (distinguishing from *Tisch* and finding the employee alleged facts to support a hostile work environment claim and the continuing violation theory when she alleged, due to her race, she was paid less, given fewer responsibilities, complained about discrimination and racist emblems on-site, and given lower performance evaluations because of her complaints).

To establish a continuing violation, Allen cites to the same isolated incidents with M.V. and D.H. as in his hostile work environment claim. As we discussed *supra*, these incidents were not sufficient for a reasonable person to conclude these actions resulted in a hostile work environment. Additionally, these events were not daily discriminatory events occurring on a regular basis but, instead, were isolated, unconnected incidents that spanned a five-year period, well before his termination. To the extent that the trial court found that the untimely acts of alleged discrimination were not part of a continuing violation, we find the trial court did not err.

Point six is denied.

## Conclusion

The trial court's judgment is affirmed.

_____
Janet Sutton, Presiding Judge

Alok Ahuja and Mark D. Pfeiffer, JJ. concur.

20